Transcript of the Testimony of:

# DANIELLE BOYLE

**Date:** February 28, 2017

**Case:** ROD SLAPPY-SUTTON v. SPEEDWAY, LLC

DIAMOND COURT REPORTING
Phone: 856-589-1107
Fax: 856-589-4741
Email: dcr.diamond@comcast.net

## Page 1

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

-------------------------
ROD SLAPPY-SUTTON,          :
          And               :
JEAN SUTTON h/w            :
                            :
          Plaintiffs,   : NO.
                        : 2:16-CV-04765
          vs.             :
                            :
SPEEDWAY, LLC,            :
                            :
          Defendant.   :
-------------------------
          - - -
          February 28, 2017
          - - -
          Oral Deposition of DANIELLE BOYLE,
taken at the Law Offices of Litchfield Cavo, 1515
Market Street, Suite 1220, Philadelphia,
Pennsylvania 19102, on the above date, beginning
at approximately 1:32 p.m., before Douglas S.
Diamond, Certified Court Reporter and Notary
Public in and for the Commonwealth of
Pennsylvania, there being present.
          - - -
          DIAMOND COURT REPORTING
          4 Emerson Lane
          Sewell, New Jersey 08080
          (856) 589-1107
          FAX  (856) 589-4741

## Page 2

1  A P P E A R A N C E S:
2      FOX LAW, P.C.
3      BY: JOHN F. FOX, JR., ESQUIRE
       TWO LOGAN SQUARE
       100 NORTH 18TH STREET
4      SUITE 2030
       PHILADELPHIA, PENNSYLVANIA 19103
5      Counsel for the Plaintiff
       Tel. (215) 568-6868
6      E-mail: johnfox@jfoxlaw.com
7          * * * * *
8      LITCHFIELD CAVO, LLP
       BY: MICHAEL T. DROOGAN, JR., ESQUIRE
9      1515 MARKET STREET
       SUITE 1220
10     PHILADELPHIA, PENNSYLVANIA 19102
       Counsel for the Defendants
11     Tel. (215) 557-0111
       E-mail: droogan@litchfieldcavo.com
12
           * * * * *
13
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1              I N D E X
2  WITNESS                    PAGE
3  DANIELLE BOYLE
4  Examination by Mr. Fox:          4
5
6
7
8
9
10
11            EXHIBITS
   NO.       DESCRIPTION        PAGE
12
   Boyle-1      Statement         32
13
   Boyle-2   01-21-2016 e-mail     36
14
   Boyle-3   Accident/Incident Report   41
15
   Boyle-4   Photocopy of Photograph    47
16
17
18
19
20
21
22
23
24

## Page 4

1              - - -
2          (It was stipulated by and between
3      counsel that signing, sealing,
4      certification and filing be waived; and
5      that all objections, except as to the
6      form of the question, be reserved until
7      the time of trial.)
8              - - -
9          . . . DANIELLE BOYLE, having been
10     duly sworn, as a witness, was examined
11     and testified as follows . . .
12             - - -
13          EXAMINATION
14             - - -
15 BY MR. FOX:
16     Q.    Can you state your name for the
17 record, please?
18     A.    Danielle Boyle.
19     Q.    Danielle, my name is John Fox.  And
20 I represent Rob Sutton with respect to an incident
21 that occurred on January 19th of 2016 at the
22 Speedway location in Easton Road.  I'm going to be
23 asking you a number of questions about your
24 knowledge of that event.

b24c7926-dc28-4b43-be00-63acfae62e30

Page 5

1      And have you ever given a
2  deposition before?
3      A.    No.
4      Q.    Okay.  I'm sure your attorney has
5  told you how it works.  I'll give you some minimal
6  instructions.  I don't always ask the most artful
7  questions.  So if you don't understand a question
8  that I ask, just tell me and I'll try to rephrase
9  it in a way that you do.  There's a court reporter
10 taking down what you and I are saying.  So he can
11 only take one of us talking at a time.  So let me
12 finish my question before you answer.  All right?
13      Also, he can't take down nods of
14 the head as an answer.  You have to verbally
15 respond to the question.  We may, and I can tell
16 you that almost all of the time a witness does
17 this, where they'll go uh-huh or something like
18 that, and we'll just say is that a yes or is that
19 a no or something.  We're not trying to be rude,
20 but we're trying to make sure the record is clear
21 on what you actually meant by your uh-huh or nod
22 of the head.  Okay?
23      A.    Yes.
24      Q.    Where do you currently reside?

Page 6

1      A.    In Bucks County.
2      Q.    Are you married?
3      A.    I am not.
4      Q.    Where are you employed?
5      A.    At Speedway.
6      Q.    And for how long have you been
7  employed by Speedway?
8      A.    Approximately four years.
9            MR. DROOGAN:  Off the record.
10             - - -
11      (Whereupon, a discussion took place
12       off the stenographic record.)
13             - - -
14 BY MR. FOX:
15      Q.    Your counsel informed me that
16 actually there's been four years and part of that
17 four years was working for Hess?
18      A.    Correct.
19      Q.    So when you started working -- when
20 did you start working for Hess?
21      A.    I don't remember the actual year,
22 but it was in July.
23      Q.    And what location did you start out
24 at?

Page 7

1      A.    I started out in Richboro, Bucks
2  County.
3      Q.    And what was your position when you
4  started out at Hess?
5      A.    CSR.
6      Q.    That's customer service
7  representative?
8      A.    Yes.
9      Q.    And were you trained by Hess to be
10 a CSR at that time?
11      A.    Yes.
12      Q.    And can you tell me a little bit
13 about your training?
14      A.    They trained us with lottery.  They
15 trained us how to run the registers.  They trained
16 us about watching your surroundings.  We were
17 trained on the outside and change the trash cans,
18 changing the paper outside so the guests can get
19 the receipts.  That's our training.
20      Q.    Was the training by video, paper or
21 just personal instruction?
22            MR. DROOGAN:  Objection to the form
23       of the question.
24            You may answer.

Page 8

1            MR. FOX:  Let me rephrase.
2  BY MR. FOX:
3      Q.    How were you trained?
4      A.    I was trained on a web-based
5  training and also as a person.
6      Q.    Did your training, was a part of
7  your training, did it include pedestrian safety on
8  the premises?
9      A.    Yes.
10      Q.    Can you tell me what that involved?
11      A.    Watching your surroundings, if a
12 guest needs your help you help them.
13      Q.    And for how long did you work at
14 the Richboro location?
15      A.    That's the one I'm not 100 percent
16 sure.  I would say a little bit over a year.
17      Q.    And while you were there for that
18 year or so, did you stay as a customer service
19 representative or did you move into another
20 position?
21      A.    I moved into assistant manager.
22      Q.    About what -- in that year or so,
23 when did you move into that position?
24      A.    Six to eight months.

Page 9

1      Q.    And what are the responsibilities
2  of an assistant manager at that location?
3      A.    To train the staff, the new staff
4  that comes in, to deal with the guests as everyday
5  problems come, arise, and to deal with everyday
6  problems in the store.
7      Q.    When you left the Hess store in
8  Richboro, was your title still assistant manager?
9      A.    No.
10     Q.    You were promoted again?
11     A.    I was. I'm a manager.
12     Q.    You were the manager?
13     A.    Yes.
14     Q.    Became a manager?
15     A.    Correct.
16     Q.    Okay. Now, what is the difference
17 between a manager and assistant manager at that
18 location?
19     A.    At that location I was what they
20 called CMT, a training manager in training. And
21 once you get done your training as a CMT you
22 become a manager and you get your own store.
23     Q.    And what were your responsibilities
24 as a manager of your own store?

Page 10

1      A.    Paperwork, dealing with the guests,
2  everyday activity what goes on throughout the
3  site.
4      Q.    Was there further training involved
5  in becoming an assistant manager?
6      A.    More web-based and more shadowing
7  people.
8      Q.    Was there further training with
9  respect to being a manager?
10     A.    More web-based and more shadowing
11 people.
12     Q.    As an assistant manager or manager
13 for Hess at the Richboro location, did you ever
14 become involved in decisions with respect to
15 whether or not a sidewalk curb would be painted?
16     A.    No.
17     Q.    At the Richboro location when you
18 were there, were there any sidewalks or sidewalk
19 curbs painted in front of the loca -- in front of
20 the store?
21     A.    Not to my knowledge.
22     Q.    When you're -- you said you were
23 there for about a year. Where did you go next?
24     A.    Glenside.

Page 11

1      Q.    And when you went there, did you go
2  -- was your title as manager?
3      A.    Yes.
4      Q.    So now you really have your own
5  store; correct?
6      A.    Correct.
7      Q.    And so was this about three years
8  ago?
9      A.    Tomorrow is three years.
10     Q.    And when you went there, was it
11 still a Hess location?
12     A.    Yes.
13        MR. DROOGAN:  I'm sorry, tomorrow
14     is three years in Glenside?
15        THE WITNESS:  In Glenside.
16        MR. DROOGAN:  Three years in
17     Glenside.
18 BY MR. FOX:
19     Q.    And I think your counsel may have
20 said this on the record, but do you remember when
21 it switched from being a Hess to a Speedway?
22     A.    I don't remember exactly, no.
23     Q.    Do you remember what year it was
24 in?

Page 12

1      A.    I do not recall.
2      Q.    Did your duties change at all from
3  being a manager at the Glenside location as
4  compared to the Richboro location?
5      A.    I had more responsibility. I was
6  the only one that was in charge.
7      Q.    Did you hire the CSRs and the
8  assistant managers?
9      A.    Yes.
10     Q.    Were they also interviewed by
11 anyone above you?
12     A.    Not at the beginning.
13     Q.    That policy changed?
14     A.    Yes.
15     Q.    When did it change?
16     A.    I do not recall.
17     Q.    Starting when you went to the
18 Glenside location, what were your hours?
19     A.    I worked 50 hours a week.
20     Q.    Would they be the same hours each
21 day?
22     A.    No.
23     Q.    Can you explain how you would --
24     A.    The manager has to be in the store

b24c7926-dc28-4b43-be00-63acfae62e30

Page 13

1    whenever needed.  If someone calls out and you
2    already did 50 hours you still have to be in the
3    store.  Just every day, every week changed.  No
4    day was ever the same.
5         Q.    Did you move closer to Glenside
6    when you got the position?
7         A.    No.
8         Q.    You stayed in Bucks County?
9         A.    Yes.
10        Q.    Are you still in Bucks County?
11        A.    I am.
12        Q.    Where did you go to high school?
13        A.    Neshaminy.
14        Q.    What year did you graduate?
15        A.    '92.
16        Q.    Upon graduation, did you go to any
17   other educa -- achieve any other higher education?
18        A.    No.
19        Q.    Upon graduation, where did you go
20   to work?
21        A.    In restaurants, mostly restaurants.
22        Q.    Were they mostly restaurants before
23   you got the CSR job at Hess?
24        A.    Yes.

Page 14

1         Q.    I know you don't remember exactly
2    when Speedway took over the location in terms of a
3    date.  But do you have a recollection of them
4    taking it over?
5         A.    Yes.
6         Q.    Just, in general?
7         A.    Yes.
8         Q.    And did they keep you in the
9    position of manager once Speedway took over?
10        A.    Yes.
11        Q.    And what, if anything, changed at
12   that location as a result of Speedway taking over
13   the location?
14        A.    They changed some paperwork, some
15   different ways of doing their paperwork.  But
16   pretty much everything else seemed to be day to
17   day the same.  They changed some of the
18   remodeling, the signage, the outside signage,
19   inside signage, coffeepots.
20        Q.    Did they come in and retrain with
21   respect to their systems?
22        A.    Yes.
23        Q.    What was involved with that?
24        A.    A manager from a Speedway in

Page 15

1    another state came to our store and individually
2    worked with us for a week.
3              MR. DROOGAN:  Off the record.
4              - - -
5              (Whereupon, a discussion took place
6          off the stenographic record.)
7              - - -
8    BY MR. FOX:
9         Q.    And did they use the same -- let's
10   say, for example, accident forms or incident
11   forms.  Were they the same forms that Hess used or
12   did they have their own set of forms?
13        A.    They have their own set of forms.
14        Q.    And the hierarchy when Speedway
15   came in, who did you report to?
16        A.    Corporate.
17        Q.    Was there a regional manager for
18   your location?
19        A.    Yes.
20        Q.    And who was the regional manager at
21   the time you took over?  And then I'll ask you --
22        A.    Tom Vitarelli.
23        Q.    Vitarelli?
24        A.    Vitarelli, yeah.

Page 16

1         Q.    And did that change?
2         A.    Yes.
3         Q.    Who did it change to?
4         A.    Ray Huff.
5         Q.    Now, did you hire Kate McCarthy?
6         A.    I did.
7         Q.    And the video system that's
8    currently in place at your location, was that
9    there when it was a Hess?
10             MR. DROOGAN:  Did Hess have video
11         you're asking?
12             MR. FOX:  Yes.
13             THE WITNESS:  Yes.
14   BY MR. FOX:
15        Q.    Was it the same system as it is now
16   or did they change?
17        A.    They changed.
18        Q.    Did Speedway change it?
19        A.    They changed it, yes.
20        Q.    In what way?
21        A.    Hess had video about Hess ways and
22   different ways what Hess stands for and Speedway
23   --
24             MR. DROOGAN:  No.  He means --

1    what --
2         MR. FOX:  I didn't ask the right
3    question.
4  BY MR. FOX:
5         Q.    I'm talking about surveillance
6    video.
7         MR. DROOGAN:  Hold it right there.
8         - - -
9         (Whereupon, a discussion took place
10   off the stenographic record.)
11        - - -
12  BY MR. FOX:
13        Q.    Going back to when it was a Hess,
14   was there a store security system?
15        A.    There was.
16        Q.    And did that store security system
17   include video surveillance?
18        A.    It did.
19        Q.    Once Speedway took over, did that
20   system change?
21        A.    It did.
22        Q.    In what way did it change?
23        A.    It gave us more video, more angle,
24   more views, more cameras.

1         A.    Yes.
2         Q.    I'm not trying to mislead you.
3    I've been given some information about some work
4    that was done involving the automatic tank gauge
5    system that looks like it was done in September or
6    October of 2016 -- '15, I'm sorry, '15.
7              Do you recall that work?
8         A.    Yes.
9         Q.    What do you recall about that work?
10        A.    Crompco came out and they were
11   putting electric lines in for a reader route.
12        Q.    And do you recall where they ran
13   these lines?
14        A.    They ran the lines from the drop
15   tanks all the way to the side in front of the
16   store to the side where the dumpsters are.
17        Q.    So if you're looking at your store
18   from the front, they would run -- can you describe
19   how they would run?
20        A.    Right along the front of the curb
21   from the gas lines all the way over from the curb
22   all the way around the curb to the dumpsters.
23        Q.    Did you have any involvement with
24   that work?

1         Q.    And in your training that you
2    received with respect to Speedway coming in, did
3    it include training on when you should tag a video
4    or retain a video because of certain events that
5    occurred at the station?
6         A.    Yes.
7         Q.    What did that training state?
8         A.    Any type of accidents and any time
9    we needed it as well we could call corporate and
10   they would be able to freeze that time frame as
11   well.
12        Q.    Remotely?
13        A.    Remotely.  And if a cop comes in
14   and they would like to see the video, we had to
15   let them see the video.
16        Q.    When Speedway took over the
17   location, do you recall -- you mentioned signage
18   and some other things inside the store.
19              Do you remember any construction
20   work being done outside?
21        MR. DROOGAN:  When Speedway took
22   over?
23  BY MR. FOX:
24        Q.    After Speedway took over?

1         A.    No.
2         Q.    Did you ever speak to anyone on the
3    construction, the Crompco or any of the Speedway
4    engineers while that work was being done?
5         A.    No.
6         Q.    Did they tell you that the work was
7    going to be done, that someone was going to be
8    coming in and doing this work?
9         A.    Yes.
10        Q.    Is that about all you really knew
11   about the work?
12        A.    Correct, yes.
13        Q.    Was the station still able to be
14   operated while this work was being done?
15        A.    Yes.
16        Q.    Do you have a recollection of how
17   long it took for them to do this work?
18        A.    Approximately a week.
19        Q.    Were you still able to pump gas --
20   were customers still able to purchase gas while
21   this was going on?
22        A.    Yes.
23        Q.    Once the work was completed, did
24   you have any conversations with Crompco employees

1 or Speedway with what I'll call maintenance
2 engineers regarding that work?
3      A.    No.
4      Q.    Prior to that work being done,
5 where the cars sit in your parking lot, was that a
6 macadam surface or some other type of surface?
7      A.    I don't understand.
8      Q.    Where the cars pull in near the
9 pumps, is it -- can you describe the surface of
10 the I'll call it the driveway?
11      A.    There's pads.
12      Q.    There's pads; correct?
13      A.    Uh-huh.
14            MR. DROOGAN:  Yes?
15            THE WITNESS:  Yes.
16 BY MR. FOX:
17      Q.    All right.  And then outside of the
18 pads, like between the pads and the front door of
19 the store, what was that?  And I'm talking before
20 this work was done.
21            MR. DROOGAN:  You're asking before
22       the work was done?
23            MR. FOX:  Yes.
24            THE WITNESS:  Almost like a

1        blacktop.
2 BY MR. FOX:
3      Q.     If I use the word macadam, does
4 that sound good?
5      A.    Yes.
6            MR. DROOGAN:  That's what you're
7       going to call asphalt or blacktop?
8            MR. FOX:  I'll call it whatever you
9       want.  Asphalt is fine.
10 BY MR. FOX:
11      Q.     Did that asphalt come all the way
12 up to the curb of the sidewalk?
13      A.    Yes.
14      Q.    So is it fair to say that when they
15 did this construction work that asphalt was
16 disturbed because they had to dig a line or dig a
17 hole to put these lines in in front of the store?
18      A.    Yes.
19      Q.    All right.  Now, this accident
20 happened on January 19th of 2016, a little over a
21 year ago.  Were you there when this happened?
22      A.    No.
23      Q.    Were you at home?
24      A.    Yes.

1      Q.     Do you know who was on duty when
2 this happened?  I can tell you it happened at
3 6:41.
4      A.    Kate McCarthy.
5      Q.    Anyone else?
6      A.    No.
7      Q.    So when you're doing your shift,
8 manning your shifts, is it typically one person
9 per shift?
10      A.    Yes.
11      Q.    And then two when you're there?
12      A.    Yes.
13      Q.    Including yourself?
14      A.    Yes.
15      Q.    What were Kate's hours that day?
16      A.    I don't recall.
17      Q.    Did her hours move around or were
18 they pretty consistent?
19      A.    She mostly worked nights.
20      Q.    If she works nights, when would she
21 start?
22      A.    The earliest right now is 3:00,
23 between 3:00, 4:00, 5:00.
24      Q.    And is it usually an eight-hour

1 shift?
2      A.    No, because we close at 11:00.
3      Q.    Did the CSRs do shift reports?  Let
4 me ask you this.  Does Speedway use shift reports
5 that are completed by CSRs?
6      A.    On a register?
7      Q.    For anything, whether it's
8 maintenance checks, checkoff lists, things like
9 that?
10      A.    Yes.
11      Q.    Is that something that they would
12 do?
13      A.    Yes.
14      Q.    And what is on that list?
15      A.    Filling cups, straws, lids,
16 emptying the trash inside, outside; washer fluid,
17 make sure it's full; we have blue towels outside,
18 sweep the parking lot, pick up the trash.  The
19 dumpster area has to be always closed, the lids
20 and the doors.  Fill the coolers, make sure all of
21 the stock in the back comes out front.
22      Q.    And is that a paper with a
23 checklist that they check off?
24      A.    Yes.

b24c7926-dc28-4b43-be00-63acfae62e30

Page 25

1       Q.     Is it filled out just once during a
2   shift or throughout the shift?
3       A.     Throughout a shift.
4       Q.     Is that something that the CSR
5   would fill out or would you also fill it out?
6       A.     Whoever is working.
7       Q.     Are you ever there just by
8   yourself?
9       A.     Yes.
10      Q.     And when are you there just by
11  yourself?
12      A.     When people don't show up.
13      Q.     So your job is not to be a CSR if
14  you can avoid it?
15      A.     Yes.
16      Q.     To put it nicely.  All right.
17          So how did you learn about this
18  accident?
19      A.     Kate called me on the phone.
20      Q.     And what did she tail you?
21      A.     She said a guest has fallen outside
22  by the front doors.
23      Q.     And anything else she said to you?
24      A.     I just asked her, you know, what

Page 26

1   happened.
2       Q.     All right.  And is that all she
3   said is a guest fell outside near the front doors?
4       A.     No.  She said she's calling 911.
5          And I said, if the guest needs a
6   chair or anything, get him a chair, whatever the
7   guest needs.
8          She said, the guest cannot get up.
9          I said, well, what happened, how do
10  you think they fell?
11         And she said, he was rushing to go
12  to his son's sport game.
13      Q.     And did she tell you how she knew
14  that?
15      A.     I didn't ask.
16      Q.     That's what she told you?
17      A.     Yes.
18      Q.     Did she say she saw -- his name is
19  Sutton, Mr. Sutton.  Did she say that she saw Mr.
20  Sutton fall?
21      A.     No.
22      Q.     And you said she called 911;
23  correct?
24      A.     Yes.

Page 27

1       Q.     Did she do that before she called
2   you?
3       A.     Yes.
4       Q.     Did she -- was it your impression
5   that she had already gone out to assist Mr. Sutton
6   before she called you?
7       A.     It was my impression, yes.
8       Q.     Your impression since you weren't
9   there.  Did she say how she knew that he was going
10  to her son's basketball game?
11      A.     I didn't ask.
12      Q.     Anything else you recall during
13  that first conversation?
14      A.     No.
15      Q.     Did you advise her to do anything
16  other than making sure she called 911 and give him
17  a chair?
18      A.     I asked her if she would take
19  pictures of the surroundings.
20      Q.     Did she take pictures?
21      A.     She was unable to.
22      Q.     Was there a store camera that she
23  could take a picture with?
24      A.     No.

Page 28

1       Q.     Her phone?
2       A.     Her phone.  She wasn't able to.
3       Q.     So when you said take pictures you
4   were thinking she could use her phone?
5       A.     Yes.
6       Q.     Did you tell her to -- I don't know
7   if I'm using the right word -- with respect to the
8   video, video security system, to grab or clip the
9   security for that?
10      A.     No.
11      Q.     At that time?
12      A.     No.
13      Q.     After she got off the phone with
14  you, what do you recall next in terms of your
15  involvement with this incident?  Did you get
16  another call from her later?
17      A.     No.
18      Q.     Did you go to the store?
19      A.     No.
20      Q.     Did you only have one conversation
21  with her that evening?
22      A.     Yes.
23      Q.     Did you know that she could not
24  take pictures on her phone?

b24c7926-dc28-4b43-be00-63acfae62e30

Page 29

1    A.    Only when she told me.
2    Q.    And when did she tell you that she
3  was unable to take pictures?
4    A.    When I asked her to take pictures.
5    Q.    Did she already try to take
6  pictures when you asked her to take pictures?
7    A.    Not that I can recall.
8    Q.    Did you go to the station the next
9  day?
10   A.    Yes.
11   Q.    Did you have any further con -- was
12 Kate there the next day that you went there?
13   A.    No.
14   Q.    Not when you got there?
15   A.    Yes.
16   Q.    Did you speak to anyone at the
17 store?
18   A.    No.
19   Q.    Did you speak to anyone at
20 Speedway, and by that I mean your regional
21 manager, security, risk manager, about this
22 incident the following day?
23   A.    My regional manager.
24   Q.    And at that time was that Ray Huff?

Page 30

1    A.    Yes.
2    Q.    And what did you -- did you call
3  Ray or did he call you?
4    A.    I believe I called him.
5    Q.    And what did you tell Ray?
6    A.    That a guest fell at the store.
7    Q.    Did you know whether he fell going
8  into the store or coming out of the store?
9    A.    At this time, no.
10   Q.    What did Ray -- how did Ray respond
11 to you?
12   A.    Get pictures.
13      MR. FOX:  Do we have those pictures
14   that she took?
15 BY MR. FOX:
16   Q.    Okay.  You earlier or you just said
17 that Ray asked you, Mr. Huff asked you to take
18 pictures.  And your counsel was kind enough to
19 give me the page that has four photographs on it
20 that I recall is what has been provided to me as
21 part of the pictures that were taken at the scene.
22      Do you recall taking those
23 pictures?
24   A.    Yes.

Page 31

1    Q.    All right.  At that time when you
2  took those pictures, did you know what happened?
3  And when I say know what happened, I mean, did you
4  know at that point whether he fell going into the
5  store or coming out of the store?
6    A.    No.
7    Q.    Just your only knowledge at that
8  point was the general area where he fell?
9    A.    Yes.
10   Q.    All right.  Did Mr. Huff tell you
11 or ask you to do anything else other than to take
12 those pictures?
13   A.    To write a statement and get Kate
14 to write a statement as well.
15   Q.    Did he ask you to prepare an
16 incident report?
17   A.    Yes.
18   Q.    All right.  Now, Kate wasn't there
19 at that time; correct?
20   A.    Yes.
21      MR. DROOGAN:  When she took the
22   photographs?
23      MR. FOX:  Yes.
24      THE WITNESS:  She was not there.

Page 32

1  BY MR. FOX:
2    Q.    Was she coming in later on her
3  shift?
4    A.    I do not recall.
5    Q.    Do you recall when you had Kate
6  prepare her statement?
7    A.    I do not.
8    Q.    And when I say maybe in relation to
9  the date that you went and took these pictures, do
10 you recall whether it was that day or the next
11 day?  It's okay if you do not recall.
12   A.    I do not recall.
13   Q.    I'm just trying to pin you down a
14 little bit.  All right.  Rather than guessing
15 let's go through some of them.
16      MR. FOX:  Mark this as Boyle-1,
17   please.
18          - - -
19      (Whereupon, Exhibit Boyle-1 was
20   marked for identification.)
21          - - -
22 BY MR. FOX:
23   Q.    I'm showing you what's been marked
24 as Boyle-1.  And it appears to be a written

b24c7926-dc28-4b43-be00-63acfae62e30

Page 33

1    statement by Kate McCarthy.  Have you seen this
2    statement before?
3        A.    Yes.
4        Q.    It's got a Speedway customer
5    service stamp on it at the bottom right-hand
6    corner of the statement.  And I believe it looks
7    like it's dated January 27th of 2016.
8              Was this a statement -- was this
9    statement -- did you send this statement to
10   Speedway, some person at Speedway?
11       A.    Yes.
12       Q.    Who did you send it to?
13       A.    It was all I know is corporate.
14       Q.    When you say corporate, is there a
15   department?
16       A.    I was given a phone call and a
17   phone number and asked to fax out the paperwork.
18       Q.    Now, this says, received January
19   27th, which is this incident happened on January
20   19th.
21             MR. DROOGAN:  Could we go just off
22       the record for one moment?
23             MR. FOX:  Yes.
24                  - - -

Page 34

1              (Whereupon, a discussion took place
2         off the stenographic record.)
3                  - - -
4              (Whereupon, a pertinent portion of
5         the record was read back by the court
6         reporter.)
7                  - - -
8    BY MR. FOX:
9        Q.    We were looking at the statement
10   which I'll give back to you.  And the time stamp
11   at the bottom says, January 27, 2016.  And, as I
12   said earlier, the accident happened on January
13   19th.  So is it fair to say that it was about a
14   week later that you got the statement from Kate?
15             MR. DROOGAN:  Objection to the form
16       of the question.
17             You can tell him when you got it.
18             THE WITNESS:  I do not recall when
19       I got it.
20   BY MR. FOX:
21       Q.    Do you have a recollection of
22   immediately sending it to Speedway once you got
23   it?
24       A.    Yes.

Page 35

1        Q.    Other than speaking with Mr. Huff
2    who asked you to get a statement and filling out
3    an incident report, did you speak to anyone else
4    at Speedway concerning this incident?
5        A.    Yes.
6        Q.    Who did you speak to?
7        A.    Someone from corporate.
8        Q.    Were they from the risk department?
9        A.    I don't recall.
10       Q.    What was your conversation with
11   them?
12       A.    They asked me to take measurements
13   of the curb.
14       Q.    Was that after you took the
15   pictures or was this during the process of taking
16   pictures?
17       A.    During the process of taking
18   pictures.
19       Q.    So in addition to Mr. Huff you had
20   a conversation with someone in corporate?
21       A.    Yes.
22       Q.    Mr. Huff told you to take pictures;
23   correct?
24       A.    Yes.

Page 36

1        Q.    And then someone at corporate said
2    to get measurements, also?
3        A.    Yes.
4        Q.    As part of the pictures?
5        A.    Yes.
6        Q.    All right.  As we look at the
7    pictures that are in front of you, is that the
8    reason for the ruler there?
9        A.    Yes.
10       Q.    And, again, at this time you don't
11   personally have knowledge of how this accident
12   happened in terms of whether he was going in or
13   out?
14       A.    Yes, I do not.
15       Q.    Since you didn't prepare that
16   statement I'm not going to ask you any questions
17   about it.
18       A.    Okay.
19             MR. FOX:  Mark this as Boyle-2,
20       please.
21                  - - -
22             (Whereupon, Exhibit Boyle-2 was
23       marked for identification.)
24                  - - -

Page 37

BY MR. FOX:

Q.   Danielle, I'll show you what's been
marked as Boyle-2.  Can you identify that
document?

A.   Yes.

Q.   And what is it?

A.   It is a statement that I wrote.

Q.   And is it an e-mail?

A.   Yes.

Q.   And it looks like it says SSA-6725,
parentheses, Speedway, closed parentheses.

     Is that the identifier for your
location?

A.   Yes.

Q.   And it says to Ron Rude, R-u-d-e,
of Speedway.  Do you know a Ron Rude?

A.   No.

Q.   How is it that -- or how is it that
you came to write this e-mail to the Ron Rude?

A.   The person that called and asked
for the pictures from the measurements.

Q.   Was that the person?

A.   I believe so.

Q.   All right.  And the date is

Page 38

Thursday, January 21st of 2016 at 8:17 a.m. in the
morning?

A.   Yes.

Q.   All right.  So this is two days
after the incident?

A.   Yes.

Q.   All right.  In the second line you
say, the guest was walking into the store and he
never stepped up on the curb.  Do you see that?

A.   Yes.

Q.   All right.  Was it your impression
that the guest fell while walking into the store?

A.   Yes.

Q.   At that time?

A.   At that time, yes.

Q.   So is it fair to say at that time
you had not pulled the video and looked at the
video?

A.   Yes.

Q.   The next line you say, I don't have
a name of the guest.  You can see everything on
camera, it was right at the doorway.

     When you say you can see everything
on camera, it was right at the doorway, what

Page 39

camera are you referring to?

A.   There's three or four cameras
there.

Q.   Is that part of the security?

A.   Yes.

Q.   Video?

A.   Uh-huh.

Q.   So had you looked at that?

A.   Not yet.

Q.   All right.  So what you're saying
-- so when you say you can see everything on
camera you're saying it would have been captured
on camera?

A.   Yes.

Q.   It's just that you hadn't looked at
it yet?

A.   Correct.

Q.   All right.  And then it refers to
the pictures you took the day before, which would
be those; correct?

A.   Yes.

Q.   I'm not marking them.  Then the
last sentence you say, I only found if an employee
got hurt or if there was an robbery forms to fill

Page 40

out.  I was wondering if you were able to help me
with this.  What are you referring to there?

A.   I was looking for the correct form
to fill out.

Q.   For an accident?

A.   Yes.

Q.   Were they there?

A.   Yes.  I was able to find it.  They
send it to me.

Q.   Since you took over this location
as a Speedway, and I think you said that they do
have different forms than Hess had; correct?

A.   Yes.

Q.   They're on a different system?

A.   Yes.

Q.   Had you ever had an incident or an
accident report to fill out before this incident?

A.   Not that I recall.

Q.   So this is your first incident that
you have to fill out this form?

A.   Yes.

Q.   And did they tell you where to find
it?

A.   They did tell me where to find it.

b24c7926-dc28-4b43-be00-63acfae62e30

Page 41

1          Q.     Was it part of the computer system
2     or was it a drawer or where was it?
3          A.     Computer system.
4                 MR. FOX:  Mark this as Boyle-3,
5          please.
6                       - - -
7                 (Whereupon, Exhibit Boyle-3 was
8          marked for identification.)
9                       - - -
10    BY MR. FOX:
11         Q.     Danielle, I'm showing you what's
12    been marked as Boyle-3.  At the top it says,
13    Speedway, LLC accident slash incident report.
14                Is this the form that you found?
15         A.     Yes.
16         Q.     On the computer system?
17         A.     Yes.
18         Q.     And is this the form that you
19    completed?
20         A.     Yes.
21         Q.     And does it say anywhere when it
22    was that you filled out this report?
23                MR. DROOGAN:  It's two pages.  Do
24         you have both?  You have both.

Page 42

1                 THE WITNESS:  Yes.
2                 MR. DROOGAN:  I'm sorry.
3                 THE WITNESS:  That's okay.  No.
4     BY MR. FOX:
5          Q.     Do you have an independent
6     recollection of when you filled this out?
7          A.     No.
8          Q.     Would it have been after the e-mail
9     that you sent inquiring about where the forms are?
10         A.     Yes.
11         Q.     It would have been after that?
12         A.     Yes.
13         Q.     Okay.  But you don't know how long
14    after that.  When you filled out this form, had
15    you looked at the video yet?
16         A.     I don't recall.
17         Q.     Now, I've reviewed the incident
18    report and there's nothing in the section of
19    summary of incident.  Can you explain why there's
20    nothing in there?
21         A.     I wanted Kate to write something
22    because she was the one that was there at the
23    time.
24         Q.     And what Kate wrote is what we've

Page 43

1     marked as P-Boyle-1?
2          A.     Yes.
3          Q.     All right.  Did she write anything
4     else that you're aware of?
5          A.     Not that I'm aware of.
6          Q.     Did you attach her statement to the
7     incident report when you sent it back to
8     corporate?
9          A.     Yes.
10         Q.     And is it your signature on the
11    bottom of the second page?
12         A.     Yes.
13         Q.     And is it your handwriting
14    throughout the report?
15         A.     Yes.
16         Q.     Now, as part of the store
17    information section of the incident report, if you
18    go under store information it says, DVR reviewed
19    and 30 minutes before and after incident burned to
20    a CD dash R and circled yes.  Do you see that?
21         A.     Yes.
22         Q.     Did you view the security video the
23    30 minutes before and after?
24         A.     I did.  I just don't know what time

Page 44

1     period.
2          Q.     Is it fair to that say when you did
3     this report you had looked at the video?
4          A.     Yes.
5          Q.     And that's because you circled yes
6     on the form?
7          A.     Yes.
8          Q.     Now, did the video that you looked
9     at, how is that captured?  And is there a way that
10    you freeze it or capture what you want to look 30
11    minutes before, 30 minutes after, and is that sent
12    also to corporate or does corporate do their own
13    download?
14                MR. DROOGAN:  Objection to the form
15         of that question.
16                You may answer.
17                THE WITNESS:  I can look.  I can
18         look 30 minutes before and 30 minutes
19         after.
20    BY MR. FOX:
21         Q.     Do you recall looking 30 minutes
22    before and 30 minutes after?
23         A.     Yes.
24         Q.     Do you remember observing or do you

b24c7926-dc28-4b43-be00-63acfae62e30

Page 45

1  remember the video capturing Mr. Sutton's fall?
2      A.    Yes.
3      Q.    Now, once you observed the video,
4  what did you do with that video?
5      A.    I don't recall.
6      Q.    Is it something that is downloaded
7  onto a disk?
8      A.    I'm not sure.
9      Q.    Do you know if this video was
10 burned to a disk?
11     A.    I'm not sure.
12     Q.    Do you have a recollection of
13 speaking to anyone at corporate concerning the
14 video?
15     A.    No.
16     Q.    Do you have a recollection of
17 speaking to Mr. Huff about what you observed in
18 the video?
19     A.    Yes.
20     Q.    What was your -- what's your
21 recollection of that?
22     A.    That he came in with his son and he
23 bought hotdogs and gum and that when he left the
24 store he fell leaving the store.

Page 46

1      Q.    I didn't ask a good question there.
2            What I meant was what was your
3  conversation with Mr. Huff about the video?
4            MR. DROOGAN:  Other than what she
5  just said?
6            THE WITNESS:  Just what I saw.
7  BY MR. FOX:
8      Q.    Did he say anything to you about
9  the video?
10     A.    No.
11     Q.    Did he ask you to do anything else
12 with respect to this incident?
13     A.    No.
14     Q.    Is there anything else that you did
15 on your own with respect to this incident?
16     A.    No.
17     Q.    Did you ever have any additional
18 conversations with anyone at Speedway in
19 corporate?
20     A.    Not that I can recall.
21     Q.    No one ever called you up and
22 interviewed you?
23     A.    Not that I can recall.
24     Q.    Are you aware of whether anyone

Page 47

1  from corporate contacted Kate McCarthy and
2  interviewed her?
3      A.    Not that I recall.
4            MR. FOX:  Mike, this is one of the
5      pictures that my client took that did
6      not copy very well.
7            MR. DROOGAN:  I think that was
8      marked as Exhibit-4 at the deposition
9      yesterday.
10           MR. FOX:  Okay.
11           MR. DROOGAN:  I could be wrong,
12     though.
13           MR. FOX:  We'll mark this as
14     Boyle-4.
15                 - - -
16           (Whereupon, Exhibit Boyle-4 was
17     marked for identification.)
18                 - - -
19 BY MR. FOX:
20     Q.    Danielle, this was a picture taken
21 by my client's wife after the accident happened.
22 And I can represent to you that it's of the
23 sidewalk in front of the store.
24           My question is more focused in on

Page 48

1  do you see the curb then do you see the strip
2  of what I would call a whiter cement area; do you
3  see that?
4      A.    Yes.
5      Q.    All right.  Is that strip that's
6  there, is that what was created by the work that
7  Crompco did?
8      A.    Yes.
9      Q.    And before that work was done you
10 can see to your right the asphalt in that picture?
11     A.    Yes.
12     Q.    All right.  Before that work was
13 done, did that asphalt come all the way up to the
14 curb?
15     A.    Yes.
16     Q.    So this is how it was left by
17 Crompco after the work; correct?
18     A.    Yes.
19     Q.    All right.  And it stayed that way?
20     A.    Yes.
21     Q.    Until the time of the accident?
22     A.    Yes.
23     Q.    Was there -- from the time that
24 work was complete up until the time that Mr.

b24c7926-dc28-4b43-be00-63acfae62e30

Page 49

1    Sutton fell, are you aware of any conversations or
2    any recommendations as manager of the facility
3    with respect to painting the curb?
4              MR. DROOGAN:  Objection to the form
5        of the question.
6        You may answer.
7        THE WITNESS:  No.
8    BY MR. FOX:
9        Q.     Before you came to the deposition
10   today, what documents did you review?
11             MR. DROOGAN:  Objection.
12       Don't answer that.
13       MR. FOX:  Why not?
14       MR. DROOGAN:  That's not permitted
15       in Federal Court.
16   BY MR. FOX:
17       Q.     Have you seen the statement of Kate
18   McCarthy before?
19       A.     Yes.
20       Q.     Have you seen photographs of what
21   you took before?
22       A.     Yes.
23       Q.     Have you seen the incident report
24   before?

Page 50

1        A.     Yes.
2        Q.     Did you see your e-mail before?
3        A.     Yes.
4        Q.     Did you see photos that my client
5    took after the incident?
6              MR. DROOGAN:  Don't answer that.
7        MR. FOX:  Why not?
8        MR. DROOGAN:  There's decisional
9        caselaw in Federal Court that says that
10       anything that the witness reviews in
11       preparation for a deposition with their
12       counsel is privileged.
13       MR. FOX:  I understand that.  But
14       if it's a document that she's reviewed
15       I'm not asking whether she reviewed it
16       with you.
17       MR. DROOGAN:  How would she review
18       it otherwise if you just gave it to me
19       yesterday?
20       MR. FOX:  Well, I don't know.
21       MR. DROOGAN:  So you're asking her
22       if she reviewed it independently?
23       MR. FOX:  Yes.
24       MR. DROOGAN:  You can answer that

Page 51

1        question.
2        THE WITNESS:  No.
3    BY MR. FOX:
4        Q.     Are there any other documents that
5    you reviewed independent of your counsel?
6        A.     No.
7        Q.     Besides the video, you reviewed the
8    video; correct?
9        A.     Yes.
10       Q.     When you were training as an
11   assistant manager and a manager, did you receive
12   training on pedestrian safety?
13       A.     Yes.
14       Q.     And what did that training consist
15   of?
16       A.     Always know your surroundings, and
17   if a guest needs help pumping their gas or needs
18   help opening their gas tank or anything the guests
19   would need and you're able to help them.
20       Q.     As manager do you interact with the
21   maintenance team?
22       A.     Yes.
23       Q.     If something needs work at your
24   station, is it you who calls for the maintenance

Page 52

1    crew to come out?
2        A.     Yes.
3        Q.     Is there a maintenance hotline at
4    Speedway?
5        A.     Yes.
6        Q.     If you wanted to --
7        MR. DROOGAN:  Hold on.
8        Is that what it's called, a
9        maintenance hotline?
10       THE WITNESS:  Well, there's two
11       things.  There's a hotline you can call
12       if it's a really major emergency with
13       gasoline.  But there's also a thing we
14       put into the computer when we actually
15       need general repairs.
16   BY MR. FOX:
17       Q.     After this work by Crompco was
18   done, are you aware of anyone ever suggesting or
19   recommending that the cement strip that we
20   identified in Boyle-4 be made consistent with the
21   color of the asphalt?
22       A.     No.
23       Q.     If a decision is made as to if you
24   wanted, I'm not saying you did, but if you wanted

b24c7926-dc28-4b43-be00-63acfae62e30

Page 53

```
 1    to have a curb painted, is that a maintenance
 2    issue that you would call in or does that go to
 3    another level?
 4            MR. DROOGAN:  Objection to the form
 5        of the question.
 6            You're asking whether she would
 7        want something painted at the store, in
 8        general?
 9            MR. FOX:  No.  I'll be more
10        specific.
11    BY MR. FOX:
12        Q.     If you thought that a curb should
13    be painted for safety reasons, is that something
14    that you could request or does that go to a
15    different maintenance level?
16            MR. DROOGAN:  Objection to the form
17        of the question because it's purely
18        hypothetical.
19            So he's asking you a purely
20        hypothetical question.
21            And you know what, if you could
22        just ask her about something else other
23        than a curb, if she felt something
24        needed to be painted for safety reasons
```

Page 54

```
 1        I would be more comfortable with that.
 2            MR. FOX:  All right.  We'll go with
 3        that question.
 4    BY MR. FOX:
 5        Q.    Do you have the authority to ask
 6    for that or is that something you that don't get
 7    involved in?
 8        A.    I don't get involved in.
 9        Q.    Who would get involved with that;
10    if you know?
11        A.    At corporate level.
12        Q.    Are you aware of any other falls by
13    customers near the front of the store?
14        A.    No.
15        Q.    Did you ever have any more
16    discussions with Mr. Huff concerning this
17    incident?
18        A.    No.
19        Q.    Did you have any additional
20    conversations with corporate including the risk
21    department concerning this incident?
22        A.    Not that I can recall.
23            MR. FOX:  That's all I have.  Thank
24        you.
```

Page 55

```
 1                    - - -
 2            (Whereupon, the deposition
 3        concluded at 2:46 p.m.)
 4                    - - -
```

Page 56

```
 1
 2
 3            CERTIFICATION
 4
 5        I, DOUGLAS S. DIAMOND, hereby
 6    certify that the foregoing is a true and correct
 7    transcript transcribed from the stenographic notes
 8    taken by me on Tuesday, February 28, 2017.
 9
10
11
12            DOUGLAS S. DIAMOND
        Court Reporter - Notary Public
13        (This certification does not apply
14    to any reproduction of this transcript, unless
15    under the direct supervision of the certifying
16    reporter.)
17
18
19
20
21
22
23
24
```

b24c7926-dc28-4b43-be00-63acfae62e30

**A**

**a.m** 38:1
**able** 18:10 20:13,19
  20:20 28:2 40:1,8
  51:19
**accident** 15:10
  22:19 25:18 34:12
  36:11 40:5,17
  41:13 47:21 48:21
**Accident/Incident**
  3:14
**accidents** 18:8
**achieve** 13:17
**activity** 10:2
**actual** 6:21
**addition** 35:19
**additional** 46:17
  54:19
**advise** 27:15
**ago** 11:8 22:21
**angle** 17:23
**answer** 5:12,14
  7:24 44:16 49:6
  49:12 50:6,24
**appears** 32:24
**apply** 56:13
**approximately**
  1:17 6:8 20:18
**area** 24:19 31:8
  48:2
**artful** 5:6
**asked** 25:24 27:18
  29:4,6 30:17,17
  33:17 35:2,12
  37:20
**asking** 4:23 16:11
  21:21 50:15,21
  53:6,19
**asphalt** 22:7,9,11
  22:15 48:10,13
  52:21
**assist** 27:5
**assistant** 8:21 9:2,8
  9:17 10:5,12 12:8
  51:11
**attach** 43:6
**attorney** 5:4
**authority** 54:5
**automatic** 19:4

**avoid** 25:14
**aware** 43:4,5 46:24
  49:1 52:18 54:12

**B**

**back** 17:13 24:21
  34:5,10 43:7
**basketball** 27:10
**becoming** 10:5
**beginning** 1:16
  12:12
**believe** 30:4 33:6
  37:23
**bit** 7:12 8:16 32:14
**blacktop** 22:1,7
**blue** 24:17
**bottom** 33:5 34:11
  43:11
**bought** 45:23
**Boyle** 1:13 3:3 4:9
  4:18
**Boyle-1** 3:12 32:16
  32:19,24
**Boyle-2** 3:13 36:19
  36:22 37:3
**Boyle-3** 3:14 41:4,7
  41:12
**Boyle-4** 3:15 47:14
  47:16 52:20
**Bucks** 6:1 7:1 13:8
  13:10
**burned** 43:19 45:10

**C**

**C** 2:1
**call** 18:9 21:1,10
  22:7,8 28:16 30:2
  30:3 33:16 48:2
  52:11 53:2
**called** 9:20 25:19
  26:22 27:1,6,16
  30:4 37:20 46:21
  52:8
**calling** 26:4
**calls** 13:1 51:24
**camera** 27:22
  38:22,24 39:1,12
  39:13
**cameras** 17:24 39:2
**cans** 7:17

**capture** 44:10
**captured** 39:12
  44:9
**capturing** 45:1
**cars** 21:5,8
**caselaw** 50:9
**Cavo** 1:14 2:8
**CD** 43:20
**cement** 48:2 52:19
**certain** 18:4
**certification** 4:4
  56:3,13
**Certified** 1:18
**certify** 56:6
**certifying** 56:15
**chair** 26:6,6 27:17
**change** 7:17 12:2
  12:15 16:1,3,16
  16:18 17:20,22
**changed** 12:13 13:3
  14:11,14,17 16:17
  16:19
**changing** 7:18
**charge** 12:6
**check** 24:23
**checklist** 24:23
**checkoff** 24:8
**checks** 24:8
**circled** 43:20 44:5
**clear** 5:20
**client** 47:5 50:4
**client's** 47:21
**clip** 28:8
**close** 24:2
**closed** 24:19 37:11
**closer** 13:5
**CMT** 9:20,21
**coffeepots** 14:19
**color** 52:21
**come** 9:5 14:20
  22:11 48:13 52:1
**comes** 9:4 18:13
  24:21
**comfortable** 54:1
**coming** 18:2 20:8
  30:8 31:5 32:2
**COMMON** 1:1
**Commonwealth**
  1:19

**compared** 12:4
**complete** 48:24
**completed** 20:23
  24:5 41:19
**computer** 41:1,3,16
  52:14
**con** 29:11
**concerning** 35:4
  45:13 54:16,21
**concluded** 55:3
**consist** 51:14
**consistent** 23:18
  52:20
**construction** 18:19
  20:3 22:15
**contacted** 47:1
**conversation** 27:13
  28:20 35:10,20
  46:3
**conversations**
  20:24 46:18 49:1
  54:20
**coolers** 24:20
**cop** 18:13
**copy** 47:6
**corner** 33:6
**corporate** 15:16
  18:9 33:13,14
  35:7,20 36:1 43:8
  44:12,12 45:13
  46:19 47:1 54:11
  54:20
**correct** 6:18 9:15
  11:5,6 20:12
  21:12 26:23 31:19
  35:23 39:17,20
  40:3,12 48:17
  51:8 56:6
**counsel** 2:5,10 4:3
  6:15 11:19 30:18
  50:12 51:5
**County** 6:1 7:2
  13:8,10
**court** 1:1,18,21 5:9
  34:5 49:15 50:9
  56:12
**created** 48:6
**crew** 52:1
**Crompco** 19:10

20:3,24 48:7,17
  52:17
**CSR** 7:5,10 13:23
  25:4,13
**CSRs** 12:7 24:3,5
**cups** 24:15
**curb** 10:15 19:20
  19:21,22 22:12
  35:13 38:9 48:1
  48:14 49:3 53:1
  53:12,23
**curbs** 10:19
**currently** 5:24 16:8
**customer** 7:6 8:18
  33:4
**customers** 20:20
  54:13

**D**

**D** 3:1
**Danielle** 1:13 3:3
  4:9,18,19 37:2
  41:11 47:20
**dash** 43:20
**date** 1:16 14:3 32:9
  37:24
**dated** 33:7
**day** 12:21 13:3,4
  14:16,17 23:15
  29:9,12,22 32:10
  32:11 39:19
**days** 38:4
**deal** 9:4,5
**dealing** 10:1
**decision** 52:23
**decisional** 50:8
**decisions** 10:14
**Defendant** 1:9
**Defendants** 2:10
**department** 33:15
  35:8 54:21
**deposition** 1:13 5:2
  47:8 49:9 50:11
  55:2
**describe** 19:18 21:9
**DESCRIPTION**
  3:11
**Diamond** 1:18,21
  56:5,11

**difference** 9:16
**different** 14:15
  16:22 40:12,14
  53:15
**dig** 22:16,16
**direct** 56:15
**discussion** 6:11
  15:5 17:9 34:1
**discussions** 54:16
**disk** 45:7,10
**DISTRICT** 1:2
**disturbed** 22:16
**document** 37:4
  50:14
**documents** 49:10
  51:4
**doing** 14:15 20:8
  23:7
**door** 21:18
**doors** 24:20 25:22
  26:3
**doorway** 38:22,24
**Douglas** 1:17 56:5
  56:11
**download** 44:13
**downloaded** 45:6
**drawer** 41:2
**driveway** 21:10
**DROOGAN** 2:8
  6:9 7:22 11:13,16
  15:3 16:10,24
  17:7 18:21 21:14
  21:21 22:6 31:21
  33:21 34:15 41:23
  42:2 44:14 46:4
  47:7,11 49:4,11
  49:14 50:6,8,17
  50:21,24 52:7
  53:4,16
**droogan@litchfi...**
  2:11
**drop** 19:14
**duly** 4:10
**dumpster** 24:19
**dumpsters** 19:16
  19:22
**duties** 12:2
**duty** 23:1
**DVR** 43:18

**—— E ——**
**E** 2:1,1 3:1
**e-mail** 2:6,11 3:13
  37:8,19 42:8 50:2
**earlier** 30:16 34:12
**earliest** 23:22
**Easton** 4:22
**educa** 13:17
**education** 13:17
**eight** 8:24
**eight-hour** 23:24
**electric** 19:11
**emergency** 52:12
**Emerson** 1:22
**employed** 6:4,7
**employee** 39:23
**employees** 20:24
**emptying** 24:16
**engineers** 20:4 21:2
**ESQUIRE** 2:2,8
**evening** 28:21
**event** 4:24
**events** 18:4
**everyday** 9:4,5
  10:2
**exactly** 11:22 14:1
**Examination** 3:4
  4:13
**examined** 4:10
**example** 15:10
**Exhibit** 32:19
  36:22 41:7 47:16
**Exhibit-4** 47:8
**EXHIBITS** 3:11
**explain** 12:23 42:19

**—— F ——**
**F** 2:2
**facility** 49:2
**fair** 22:14 34:13
  38:16 44:2
**fall** 26:20 45:1
**fallen** 25:21
**falls** 54:12
**fax** 1:23 33:17
**February** 1:11 56:8
**Federal** 49:15 50:9
**fell** 26:3,10 30:6,7
  31:4,8 38:12

  45:24 49:1
**felt** 53:23
**filing** 4:4
**fill** 24:20 25:5,5
  39:24 40:4,17,20
**filled** 25:1 41:22
  42:6,14
**filling** 24:15 35:2
**find** 40:8,22,24
**fine** 22:9
**finish** 5:12
**first** 1:2 27:13
  40:19
**fluid** 24:16
**focused** 47:24
**following** 29:22
**follows** 4:11
**foregoing** 56:6
**form** 4:6 7:22
  34:15 40:3,20
  41:14,18 42:14
  44:6,14 49:4 53:4
  53:16
**forms** 15:10,11,11
  15:12,13 39:24
  40:12 42:9
**found** 39:23 41:14
**four** 6:8,16,17
  30:19 39:2
**Fox** 2:2,2 3:4 4:15
  4:19 6:14 8:1,2
  11:18 15:8 16:12
  16:14 17:2,4,12
  18:23 21:16,23
  22:2,8,10 30:13
  30:15 31:23 32:1
  32:16,22 33:23
  34:8,20 36:19
  37:1 41:4,10 42:4
  44:20 46:7 47:4
  47:10,13,19 49:8
  49:13,16 50:7,13
  50:20,23 51:3
  52:16 53:9,11
  54:2,4,23
**frame** 18:10
**freeze** 18:10 44:10
**front** 10:19,19
  19:15,18,20 21:18

  22:17 24:21 25:22
  26:3 36:7 47:23
  54:13
**full** 24:17
**further** 10:4,8
  29:11

**—— G ——**
**game** 26:12 27:10
**gas** 19:21 20:19,20
  51:17,18
**gasoline** 52:13
**gauge** 19:4
**general** 14:6 31:8
  52:15 53:8
**give** 5:5 27:16
  30:19 34:10
**given** 5:1 19:3
  33:16
**Glenside** 10:24
  11:14,15,17 12:3
  12:18 13:5
**go** 5:17 10:23 11:1
  13:12,16,19 26:11
  28:18 29:8 32:15
  33:21 43:18 53:2
  53:14 54:2
**goes** 10:2
**going** 4:22 17:13
  20:7,7,21 22:7
  27:9 30:7 31:4
  36:12,16
**good** 22:4 46:1
**grab** 28:8
**graduate** 13:14
**graduation** 13:16
  13:19
**guessing** 32:14
**guest** 8:12 25:21
  26:3,5,7,8 30:6
  38:8,12,21 51:17
**guests** 7:18 9:4
  10:1 51:18
**gum** 45:23

**—— H ——**
**h/w** 1:5
**handwriting** 43:13
**happened** 22:20,21
  23:2,2 26:1,9 31:2

  31:3 33:19 34:12
  36:12 47:21
**head** 5:14,22
**help** 8:12,12 40:1
  51:17,18,19
**Hess** 6:17,20 7:4,9
  9:7 10:13 11:11
  11:21 13:23 15:11
  16:9,10,21,21,22
  17:13 40:12
**hierarchy** 15:14
**high** 13:12
**higher** 13:17
**hire** 12:7 16:5
**Hold** 17:7 52:7
**hole** 22:17
**home** 22:23
**hotdogs** 45:23
**hotline** 52:3,9,11
**hours** 12:18,19,20
  13:2 23:15,17
**Huff** 16:4 29:24
  30:17 31:10 35:1
  35:19,22 45:17
  46:3 54:16
**hurt** 39:24
**hypothetical** 53:18
  53:20

**—— I ——**
**identification**
  32:20 36:23 41:8
  47:17
**identified** 52:20
**identifier** 37:12
**identify** 37:3
**immediately** 34:22
**impression** 27:4,7
  27:8 38:11
**incident** 4:20 15:10
  28:15 29:22 31:16
  33:19 35:3,4 38:5
  40:16,17,19 41:13
  42:17,19 43:7,17
  43:19 46:12,15
  49:23 50:5 54:17
  54:21
**include** 8:7 17:17
  18:3

**including** 23:13
54:20
**independent** 42:5
51:5
**independently**
50:22
**individually** 15:1
**information** 19:3
43:17,18
**informed** 6:15
**inquiring** 42:9
**inside** 14:19 18:18
24:16
**instruction** 7:21
**instructions** 5:6
**interact** 51:20
**interviewed** 12:10
46:22 47:2
**involved** 8:10 10:4
10:14 14:23 54:7
54:8,9
**involvement** 19:23
28:15
**involving** 19:4
**issue** 53:2

**J**

**January** 4:21 22:20
33:7,18,19 34:11
34:12 38:1
**JEAN** 1:5
**Jersey** 1:22
**job** 13:23 25:13
**John** 2:2 4:19
**johnfox@jfoxla...**
2:6
**JR** 2:2,8
**JUDICIAL** 1:2
**July** 6:22

**K**

**Kate** 16:5 23:4
25:19 29:12 31:13
31:18 32:5 33:1
34:14 42:21,24
47:1 49:17
**Kate's** 23:15
**keep** 14:8
**kind** 30:18
**knew** 20:10 26:13

27:9
**know** 14:1 23:1
25:24 28:6,23
30:7 31:2,3,4
33:13 37:16 42:13
43:24 45:9 50:20
51:16 53:21 54:10
**knowledge** 4:24
10:21 31:7 36:11

**L**

**Lane** 1:22
**Law** 1:14 2:2
**learn** 25:17
**leaving** 45:24
**left** 9:7 45:23 48:16
**let's** 15:9 32:15
**level** 53:3,15 54:11
**lids** 24:15,19
**line** 22:16 38:7,20
**lines** 19:11,13,14
19:21 22:17
**list** 24:14
**lists** 24:8
**Litchfield** 1:14 2:8
**little** 7:12 8:16
22:20 32:14
**LLC** 1:8 41:13
**LLP** 2:8
**loca** 10:19
**location** 4:22 6:23
8:14 9:2,18,19
10:13,17 11:11
12:3,4,18 14:2,12
14:13 15:18 16:8
18:17 37:13 40:10
**LOGAN** 2:3
**long** 6:6 8:13 20:17
42:13
**look** 36:6 44:10,17
44:18
**looked** 38:17 39:8
39:15 42:15 44:3
44:8
**looking** 19:17 34:9
40:3 44:21
**looks** 19:5 33:6
37:10
**lot** 21:5 24:18

**lottery** 7:14

**M**

**macadam** 21:6
22:3
**maintenance** 21:1
24:8 51:21,24
52:3,9 53:1,15
**major** 52:12
**making** 27:16
**manager** 8:21 9:2,8
9:11,12,14,17,17
9:20,22,24 10:5,9
10:12,12 11:2
12:3,24 14:9,24
15:17,20 29:21,21
29:23 49:2 51:11
51:11,20
**managers** 12:8
**manning** 23:8
**mark** 32:16 36:19
41:4 47:13
**marked** 32:20,23
36:23 37:3 41:8
41:12 43:1 47:8
47:17
**Market** 1:15 2:9
**marking** 39:22
**married** 6:2
**McCarthy** 16:5
23:4 33:1 47:1
49:18
**mean** 29:20 31:3
**means** 16:24
**meant** 5:21 46:2
**measurements**
35:12 36:2 37:21
**mentioned** 18:17
**MICHAEL** 2:8
**Mike** 47:4
**minimal** 5:5
**minutes** 43:19,23
44:11,11,18,18,21
44:22
**mislead** 19:2
**moment** 33:22
**months** 8:24
**morning** 38:2
**move** 8:19,23 13:5

23:17
**moved** 8:21

**N**

**N** 2:1 3:1
**name** 4:16,19 26:18
38:21
**near** 21:8 26:3
54:13
**need** 51:19 52:15
**needed** 13:1 18:9
53:24
**needs** 8:12 26:5,7
51:17,17,23
**Neshaminy** 13:13
**never** 38:9
**new** 1:22 9:3
**nicely** 25:16
**nights** 23:19,20
**nod** 5:21
**nods** 5:13
**NORTH** 2:3
**Notary** 1:18 56:12
**notes** 56:7
**number** 4:23 33:17

**O**

**Objection** 7:22
34:15 44:14 49:4
49:11 53:4,16
**objections** 4:5
**observed** 45:3,17
**observing** 44:24
**occurred** 4:21 18:5
**October** 19:6
**Offices** 1:14
**okay** 5:4,22 9:16
30:16 32:11 36:18
42:3,13 47:10
**once** 9:21 14:9
17:19 20:23 25:1
34:22 45:3
**opening** 51:18
**operated** 20:14
**Oral** 1:13
**outside** 7:17,18
14:18 18:20 21:17
24:16,17 25:21
26:3

**P**

**P** 2:1,1
**P-Boyle-1** 43:1
**P.C** 2:2
**p.m** 1:17 55:3
**pads** 21:11,12,18
21:18
**page** 3:2,11 30:19
43:11
**pages** 41:23
**painted** 10:15,19
53:1,7,13,24
**painting** 49:3
**paper** 7:18,20
24:22
**paperwork** 10:1
14:14,15 33:17
**parentheses** 37:11
37:11
**parking** 21:5 24:18
**part** 6:16 8:6 30:21
36:4 39:4 41:1
43:16
**pedestrian** 8:7
51:12
**Pennsylvania** 1:2
1:16,20 2:4,10
**people** 10:7,11
25:12
**percent** 8:15
**period** 44:1
**permitted** 49:14
**person** 8:5 23:8
33:10 37:20,22
**personal** 7:21
**personally** 36:11
**pertinent** 34:4
**Philadelphia** 1:15
2:4,10
**phone** 25:19 28:1,2
28:4,13,24 33:16
33:17
**Photocopy** 3:15
**Photograph** 3:15
**photographs** 30:19
31:22 49:20
**photos** 50:4
**pick** 24:18
**picture** 27:23 47:20

48:10
**pictures** 27:19,20
  28:3,24 29:3,4,6,6
  30:12,13,18,21,23
  31:2,12 32:9
  35:15,16,18,22
  36:4,7 37:21
  39:19 47:5
**pin** 32:13
**place** 6:11 15:5
  16:8 17:9 34:1
**Plaintiff** 2:5
**Plaintiffs** 1:6
**PLEAS** 1:1
**please** 4:17 32:17
  36:20 41:5
**point** 31:4,8
**policy** 12:13
**portion** 34:4
**position** 7:3 8:20
  8:23 13:6 14:9
**premises** 8:8
**preparation** 50:11
**prepare** 31:15 32:6
  36:15
**present** 1:20
**pretty** 14:16 23:18
**Prior** 21:4
**privileged** 50:12
**problems** 9:5,6
**process** 35:15,17
**promoted** 9:10
**provided** 30:20
**Public** 1:19 56:12
**pull** 21:8
**pulled** 38:17
**pump** 20:19
**pumping** 51:17
**pumps** 21:9
**purchase** 20:20
**purely** 53:17,19
**put** 22:17 25:16
  52:14
**putting** 19:11

**Q**

**question** 4:6 5:7,12
  5:15 7:23 17:3
  34:16 44:15 46:1

47:24 49:5 51:1
  53:5,17,20 54:3
**questions** 4:23 5:7
  36:16

**R**

**R** 2:1 43:20
**R-u-d-e** 37:15
**ran** 19:12,14
**Ray** 16:4 29:24
  30:3,5,10,10,17
**read** 34:5
**reader** 19:11
**really** 11:4 20:10
  52:12
**reason** 36:8
**reasons** 53:13,24
**recall** 12:1,16
  18:17 19:7,9,12
  23:16 27:12 28:14
  29:7 30:20,22
  32:4,5,10,11,12
  34:18 35:9 40:18
  42:16 44:21 45:5
  46:20,23 47:3
  54:22
**receipts** 7:19
**receive** 51:11
**received** 18:2 33:18
**recollection** 14:3
  20:16 34:21 42:6
  45:12,16,21
**recommendations**
  49:2
**recommending**
  52:19
**record** 4:17 5:20
  6:9,12 11:20 15:3
  15:6 17:10 33:22
  34:2,5
**referring** 39:1 40:2
**refers** 39:18
**regarding** 21:2
**regional** 15:17,20
  29:20,23
**register** 24:6
**registers** 7:15
**relation** 32:8
**remember** 6:21

11:20,22,23 14:1
  18:19 44:24 45:1
**remodeling** 14:18
**Remotely** 18:12,13
**repairs** 52:15
**rephrase** 5:8 8:1
**report** 3:14 15:15
  31:16 35:3 40:17
  41:13,22 42:18
  43:7,14,17 44:3
  49:23
**reporter** 1:18 5:9
  34:6 56:12,16
**REPORTING** 1:21
**reports** 24:3,4
**represent** 4:20
  47:22
**representative** 7:7
  8:19
**reproduction** 56:14
**request** 53:14
**reserved** 4:6
**reside** 5:24
**respect** 4:20 10:9
  10:14 14:21 18:2
  28:7 46:12,15
  49:3
**respond** 5:15 30:10
**responsibilities** 9:1
  9:23
**responsibility** 12:5
**restaurants** 13:21
  13:21,22
**result** 14:12
**retain** 18:4
**retrain** 14:20
**review** 49:10 50:17
**reviewed** 42:17
  43:18 50:14,15,22
  51:5,7
**reviews** 50:10
**Richboro** 7:1 8:14
  9:8 10:13,17 12:4
**right** 5:12 17:2,7
  19:20 21:17 22:19
  23:22 25:16 26:2
  28:7 31:1,10,18
  32:14 36:6 37:24
  38:4,7,11,22,24

39:10,18 43:3
  48:5,10,12,19
  54:2
**right-hand** 33:5
**risk** 29:21 35:8
  54:20
**Road** 4:22
**Rob** 4:20
**robbery** 39:24
**ROD** 1:4
**Ron** 37:15,16,19
**route** 19:11
**rude** 5:19 37:15,16
  37:19
**ruler** 36:8
**run** 7:15 19:18,19
**rushing** 26:11

**S**

**S** 1:17 2:1 56:5,11
**safety** 8:7 51:12
  53:13,24
**saw** 26:18,19 46:6
**saying** 5:10 39:10
  39:12 52:24
**says** 33:18 34:11
  37:10,15 41:12
  43:18 50:9
**scene** 30:21
**school** 13:12
**sealing** 4:3
**second** 38:7 43:11
**section** 42:18 43:17
**security** 17:14,16
  28:8,9 29:21 39:4
  43:22
**see** 18:14,15 38:9
  38:21,23 39:11
  43:20 48:1,1,3,10
  50:2,4
**seen** 33:1 49:17,20
  49:23
**send** 33:9,12 40:9
**sending** 34:22
**sent** 42:9 43:7
  44:11
**sentence** 39:23
**September** 19:5
**service** 7:6 8:18

33:5
**set** 15:12,13
**Sewell** 1:22
**shadowing** 10:6,10
**shift** 23:7,9 24:1,3
  24:4 25:2,2,3 32:3
**shifts** 23:8
**show** 25:12 37:2
**showing** 32:23
  41:11
**side** 19:15,16
**sidewalk** 10:15,18
  22:12 47:23
**sidewalks** 10:18
**signage** 14:18,18
  14:19 18:17
**signature** 43:10
**signing** 4:3
**sit** 21:5
**site** 10:3
**Six** 8:24
**SLAPPY-SUTT...**
  1:4
**slash** 41:13
**son** 45:22
**son's** 26:12 27:10
**sorry** 11:13 19:6
  42:2
**sound** 22:4
**speak** 20:2 29:16
  29:19 35:3,6
**speaking** 35:1
  45:13,17
**specific** 53:10
**Speedway** 1:8 4:22
  6:5,7 11:21 14:2,9
  14:12,24 15:14
  16:18,22 17:19
  18:2,16,21,24
  20:3 21:1 24:4
  29:20 33:4,10,10
  34:22 35:4 37:11
  37:16 40:11 41:13
  46:18 52:4
**sport** 26:12
**SQUARE** 2:3
**SSA-6725** 37:10
**staff** 9:3,3
**stamp** 33:5 34:10

**stands** 16:22
**start** 6:20,23 23:21
**started** 6:19 7:1,4
**Starting** 12:17
**state** 4:16 15:1 18:7
**statement** 3:12
  31:13,14 32:6
  33:1,2,6,8,9,9
  34:9,14 35:2
  36:16 37:7 43:6
  49:17
**station** 18:5 20:13
  29:8 51:24
**stay** 8:18
**stayed** 13:8 48:19
**stenographic** 6:12
  15:6 17:10 34:2
  56:7
**stepped** 38:9
**stipulated** 4:2
**stock** 24:21
**store** 9:6,7,22,24
  10:20 11:5 12:24
  13:3 15:1 17:14
  17:16 18:18 19:16
  19:17 21:19 22:17
  27:22 28:18 29:17
  30:6,8,8 31:5,5
  38:8,12 43:16,18
  45:24,24 47:23
  53:7 54:13
**straws** 24:15
**Street** 1:15 2:3,9
**strip** 48:1,5 52:19
**suggesting** 52:18
**Suite** 1:15 2:4,9
**summary** 42:19
**supervision** 56:15
**sure** 5:4,20 8:16
  24:17,20 27:16
  45:8,11
**surface** 21:6,6,9
**surroundings** 7:16
  8:11 27:19 51:16
**surveillance** 17:5
  17:17
**Sutton** 1:5 4:20
  26:19,19,20 27:5
  49:1

**Sutton's** 45:1
**sweep** 24:18
**switched** 11:21
**sworn** 4:10
**system** 16:7,15
  17:14,16,20 19:5
  28:8 40:14 41:1,3
  41:16
**systems** 14:21

**T**

**T** 2:8
**tag** 18:3
**tail** 25:20
**take** 5:11,13 27:18
  27:20,23 28:3,24
  29:3,4,5,6 30:17
  31:11 35:12,22
**taken** 1:14 30:21
  47:20 56:8
**talking** 5:11 17:5
  21:19
**tank** 19:4 51:18
**tanks** 19:15
**team** 51:21
**Tel** 2:5,11
**tell** 5:8,15 7:12 8:10
  20:6 23:2 26:13
  28:6 29:2 30:5
  31:10 34:17 40:22
  40:24
**terms** 14:2 28:14
  36:12
**testified** 4:11
**Thank** 54:23
**thing** 52:13
**things** 18:18 24:8
  52:11
**think** 11:19 26:10
  40:11 47:7
**thinking** 28:4
**thought** 53:12
**three** 11:7,9,14,16
  39:2
**Thursday** 38:1
**time** 4:7 5:11,16
  7:10 15:21 18:8
  18:10 28:11 29:24
  30:9 31:1,19

34:10 36:10 38:14
  38:15,16 42:23
  43:24 48:21,23,24
**title** 9:8 11:2
**today** 49:10
**told** 5:5 26:16 29:1
  35:22
**Tom** 15:22
**tomorrow** 11:9,13
**top** 41:12
**towels** 24:17
**train** 9:3
**trained** 7:9,14,15
  7:15,17 8:3,4
**training** 7:13,19,20
  8:5,6,7 9:20,20,21
  10:4,8 18:1,3,7
  51:10,12,14
**transcribed** 56:7
**transcript** 56:7,14
**trash** 7:17 24:16,18
**trial** 4:7
**true** 56:6
**try** 5:8 29:5
**trying** 5:19,20 19:2
  32:13
**Tuesday** 56:8
**two** 2:3 23:11 38:4
  41:23 52:10
**type** 18:8 21:6
**typically** 23:8

**U**

**uh-huh** 5:17,21
  21:13 39:7
**unable** 27:21 29:3
**understand** 5:7
  21:7 50:13
**use** 15:9 22:3 24:4
  28:4
**usually** 23:24

**V**

**verbally** 5:14
**video** 7:20 16:7,10
  16:21 17:6,17,23
  18:3,4,14,15 28:8
  28:8 38:17,18
  39:6 42:15 43:22
  44:3,8 45:1,3,4,9

45:14,18 46:3,9
  51:7,8
**view** 43:22
**views** 17:24
**Vitarelli** 15:22,23
  15:24
**vs** 1:7

**W**

**waived** 4:4
**walking** 38:8,12
**want** 22:9 44:10
  53:7
**wanted** 42:21 52:6
  52:24,24
**washer** 24:16
**wasn't** 28:2 31:18
**watching** 7:16 8:11
**way** 5:9 16:20
  17:22 19:15,21,22
  22:11 44:9 48:13
  48:19
**ways** 14:15 16:21
  16:22
**we'll** 5:18 47:13
  54:2
**we're** 5:19,20
**we've** 42:24
**web-based** 8:4 10:6
  10:10
**week** 12:19 13:3
  15:2 20:18 34:14
**went** 11:1,10 12:17
  29:12 32:9
**weren't** 27:8
**whiter** 48:2
**wife** 47:21
**witness** 3:2 4:10
  5:16 11:15 16:13
  21:15,24 31:24
  34:18 42:1,3
  44:17 46:6 49:7
  50:10 51:2 52:10
**wondering** 40:1
**word** 22:3 28:7
**work** 8:13 13:20
  18:20 19:3,7,9,24
  20:4,6,8,11,14,17
  20:23 21:2,4,20

21:22 22:15 48:6
  48:9,12,17,24
  51:23 52:17
**worked** 12:19 15:2
  23:19
**working** 6:17,19,20
  25:6
**works** 5:5 23:20
**write** 31:13,14
  37:19 42:21 43:3
**written** 32:24
**wrong** 47:11
**wrote** 37:7 42:24

**X**

**X** 3:1

**Y**

**yeah** 15:24
**year** 6:21 8:16,18
  8:22 10:23 11:23
  13:14 22:21
**years** 6:8,16,17
  11:7,9,14,16
**yesterday** 47:9
  50:19

**Z**

**0**

**01-21-2016** 3:13
**08080** 1:22

**1**

**1:32** 1:17
**100** 2:3 8:15
**11:00** 24:2
**1220** 1:15 2:9
**15** 19:6,6
**1515** 1:14 2:9
**18TH** 2:3
**19102** 1:16 2:10
**19103** 2:4
**19th** 4:21 22:20
  33:20 34:13

**2**

**2:16-CV-04765** 1:6
**2:46** 55:3
**2016** 4:21 19:6

22:20 33:7 34:11
38:1
**2017** 1:11 56:8
**2030** 2:4
**215** 2:5,11
**21st** 38:1
**27** 34:11
**27th** 33:7,19
**28** 1:11 56:8

---

**3**

**3:00** 23:22,23
**30** 43:19,23 44:10
44:11,18,18,21,22
**32** 3:12
**36** 3:13

---

**4**

**4** 1:22 3:4
**4:00** 23:23
**41** 3:14
**47** 3:15

---

**5**

**5:00** 23:23
**50** 12:19 13:2
**557-0111** 2:11
**568-6868** 2:5
**589-1107** 1:23
**589-4741** 1:23

---

**6**

**6:41** 23:3

---

**7**

---

**8**

**8:17** 38:1
**856** 1:23,23

---

**9**

**911** 26:4,22 27:16
**92** 13:15