# Transcript of the Testimony of:

# KATE MCCARTHY

**Date:** February 28, 2017

**Case:** ROD SLAPPY-SUTTON v. SPEEDWAY, LLC

DIAMOND COURT REPORTING
Phone: 856-589-1107
Fax: 856-589-4741
Email: dcr.diamond@comcast.net

## Page 1

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

---

ROD SLAPPY-SUTTON,          :
       And                  :
JEAN SUTTON h/w             :
                            :
       Plaintiffs,    : NO.
                            : 2:16-CV-04765
    vs.                     :
                            :
SPEEDWAY, LLC,              :
                            :
       Defendant.    :

---

February 28, 2017

---

Oral Deposition of KATE MCCARTHY, taken at the Law Offices of Litchfield Cavo, 1515 Market Street, Suite 1220, Philadelphia, Pennsylvania 19102, on the above date, beginning at approximately 2:48 p.m., before Douglas S. Diamond, Certified Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, there being present.

---

DIAMOND COURT REPORTING
4 Emerson Lane
Sewell, New Jersey 08080
(856) 589-1107
FAX (856) 589-4741

## Page 2

1  APPEARANCES:
2  FOX LAW, P.C.
   BY: JOHN F. FOX, JR., ESQUIRE
3  TWO LOGAN SQUARE
   100 NORTH 18TH STREET
4  SUITE 2030
   PHILADELPHIA, PENNSYLVANIA 19103
5  Counsel for the Plaintiff
   Tel. (215) 568-6868
6  E-mail: johnfox@jfoxlaw.com
7            * * * * *
8  LITCHFIELD CAVO, LLP
   BY: MICHAEL T. DROOGAN, JR., ESQUIRE
9  1515 MARKET STREET
   SUITE 1220
10 PHILADELPHIA, PENNSYLVANIA 19102
   Counsel for the Defendants
11 Tel. (215) 557-0111
   E-mail: droogan@litchfieldcavo.com
12
            * * * * *

## Page 3

1              I N D E X
2  WITNESS                              PAGE
3  KATE MCCARTHY
4  Examination by Mr. Fox:              4
5  Examination by Mr. Droogan:          19

13              EXHIBITS
   NO.       DESCRIPTION             PAGE
14
            None Marked

## Page 4

1            ---
2         (It was stipulated by and between
3  counsel that signing, sealing,
4  certification and filing be waived; and
5  that all objections, except as to the
6  form of the question, be reserved until
7  the time of trial.)
8            ---
9         . . . KATE MCCARTHY, having been
10 duly sworn, as a witness, was examined
11 and testified as follows . . .
12           ---
13        EXAMINATION
14           ---
15 BY MR. FOX:
16    Q.   Can you state your name for the
17 record, please?
18    A.   Kate McCarthy.
19    Q.   Kate, my name is John Fox.  I
20 represent Rod Sutton and his wife with respect to
21 an accident that happened on January 19th of 2016
22 at what I'll call the Glenside Speedway.  It was
23 my understanding that you were there that night.
24 So I have some questions about what knowledge you

Page 5

1  have, if any, concerning the incident.
2        Have you ever given a deposition
3  before?
4    A.   No.
5    Q.   It shouldn't take very long. But
6  if you don't understand a question that I ask,
7  just let me know and I'll try to rephrase it in a
8  way that you do. The court reporter can only take
9  one of us talking at a time. So let me finish my
10 question before you answer. Also, the court
11 reporter can't take down nods of the head or
12 uh-huh. So you have to verbally respond to the
13 question. Also, this happened over a year ago.
14 So I don't want you to guess. If you feel you're
15 guessing, just tell me and I'll try to rephrase it
16 in a way that might narrow it down a little bit.
17 But I don't want guesses. All right?
18       Where do you currently reside?
19   A.   In Glenside.
20   Q.   Are you married?
21   A.   No.
22   Q.   Where are you currently employed?
23   A.   Speedway.
24   Q.   And what is your position there?

Page 6

1    A.   Cashier.
2    Q.   And for how long have you been
3  employed there?
4    A.   I started the Monday before
5  Thanksgiving last year, over a year.
6    Q.   In 2015?
7    A.   Yes.
8    Q.   And what are your duties as a
9  cashier?
10   A.   To ring up customers, sell things
11 out of the convenience store.
12   Q.   Did you receive training --
13   A.   Yes.
14   Q.   -- to become a cashier?
15   A.   Yes.
16   Q.   Or as Speedway likes to call them,
17 customer service reps?
18   A.   Yes.
19   Q.   CSRs. And what was your training?
20   A.   I worked with someone on the
21 registers and they showed me how to ring things
22 up.
23   Q.   And did you work a particular shift
24 or did it change?

Page 7

1    A.   In the beginning it was some
2  mornings, but more like evenings later on.
3    Q.   And what was your typical time to
4  start an evening shift?
5    A.   Anywhere from 3:00 to 5:00 p.m.
6    Q.   And how long was your shift?
7    A.   Anywhere from eight to six hours
8  because I close.
9    Q.   When you started there, was it a
10 24-hour location?
11   A.   No.
12   Q.   What time would it close?
13   A.   11:00.
14   Q.   And when you are on your shift, are
15 you the -- on the night shift, what I'll call the
16 night shift, are you the only one on a shift?
17   A.   Yes.
18   Q.   Now, this accident happened on
19 January 19th of 2016. So it looks like you would
20 have been there a few months before this accident
21 as a cashier?
22   A.   Yes.
23   Q.   And do you recall, you have an
24 independent recollection of this incident?

Page 8

1    A.   Yes.
2    Q.   How did you become aware of the
3  accident?
4    A.   I was at the register. All of a
5  sudden I heard a yell. I looked outside. I saw a
6  man on the ground.
7    Q.   Do you recall waiting on this man
8  at the register?
9    A.   Yes.
10   Q.   Had you ever seen this man before
11 the accident?
12   A.   No.
13   Q.   Is it fair to say you did not
14 witness this accident?
15   A.   Yes, it is fair to say I didn't.
16   Q.   So did you hear something?
17   A.   I heard him yell.
18   Q.   Heard him yell, okay.
19       And when you heard him yell, what
20 did you do?
21   A.   I went outside. Well, I turned,
22 saw him on the ground and went outside.
23   Q.   And when you went outside, did you
24 say anything to him?

2 (Pages 5 to 8)

5310e10a-900f-491f-a102-512c32e207fd

Page 9

1  A. I can't recall exactly. If he was
2  okay, call an ambulance.
3  Q. Had you called 911 before you went
4  outside?
5  A. I don't recall. I called them and
6  then went outside because I had to ask a question
7  for the operator.
8  Q. The 911 operator?
9  A. Yes.
10  Q. So did you hang up with 911 or were
11  they still on the line when you went outside?
12  A. They were still on the line.
13  Q. What did you ask Mr. Sutton?
14  A. I can't recall.
15  Q. Do you recall Mr. Sutton saying
16  anything to you?
17  A. Yes.
18  Q. What did he say?
19  A. He said that he wasn't -- he was
20  late for his son's game, he wasn't paying any --
21  he wasn't paying attention and he tripped on his
22  own feet.
23  Q. And was he on the ground when he
24  said that?

Page 10

1  A. Yes.
2  Q. Did he appear to be in pain?
3  A. Yes.
4  Q. Did he say anything else?
5  A. He thought he might have dislocated
6  his kneecaps.
7  Q. What information did 911 want you
8  to get?
9  A. I don't recall.
10  Q. Did he say anything else to you at
11  that time?
12  A. No, not that I recall right now.
13  Q. Did you go back in to pick up your
14  conversation with 911?
15  A. We finished and I hung up. And I
16  believe I said they were on the way.
17  Q. Did you go back out to where Mr.
18  Sutton was in the driveway?
19  A. I don't recall. No, I don't.
20  Q. Did you have to wait on -- were
21  there other customers in the store?
22  A. Yes, there were.
23  Q. That you needed to attend to?
24  A. Yes.

Page 11

1  Q. Did you attend to those customers
2  while Mr. Sutton was waiting for the ambulance to
3  come?
4  A. Yes.
5  Q. Did you go back out to attend to
6  Mr. Sutton at any time before the ambulance came?
7  A. Yes, I did.
8  Q. And when was that?
9  A. Shortly after to tell him the
10  ambulance was coming or just to see how he was
11  doing and saying he was on his way.
12  Q. Any other conversations about what
13  happened?
14  A. No.
15  Q. Did you speak to his wife?
16  A. She just mouthed thank you a few
17  times to me, but we didn't really -- I think I
18  asked her originally if she wanted me to call the
19  ambulance. She said yes. But basically she just
20  mouthed thank you.
21  Q. Did you call Danielle Boyle?
22  A. Yes.
23  Q. At what point in the process of
24  this whole scenario did you call her?

Page 12

1  A. After I talked to 911 and the
2  ambulance was on the way.
3  Q. Did you talk to her before the
4  ambulance got there?
5  A. Yes.
6  Q. What did you tell Danielle?
7  A. That a customer had fallen and I
8  had to call an ambulance.
9  Q. At that time did you know that he
10  had fallen going out of the store rather than
11  coming into the store, that he had fallen out of
12  the store?
13  A. Yes.
14  Q. Did you tell Danielle that?
15  A. I don't recall exactly what I told
16  her. I just said a customer had fallen.
17  Q. And what was her response?
18  A. She asked if he was okay, if I
19  could do anything, get a chair maybe. I said the
20  ambulance was on the way, he was laying there,
21  there wasn't really anything else I could do.
22  Q. Did she ask you to do anything
23  else?
24  A. Not that I recall. I just told her

Page 13

1  what happened. And then she heard the ambulance
2  coming.
3      Q.   Are you familiar with the security
4  system at the store, the surveillance security
5  system?
6      A.   I know it's on.
7      Q.   Were you asked to grab the video of
8  what would have captured this incident?
9      A.   No, un-unh, no.
10     Q.   Do you recall the ambulance coming?
11     A.   Yes.
12     Q.   Do you remember any other
13 conversations that you would have had with Mr.
14 Sutton, his wife, his son who was there during
15 that time?
16     A.   No.
17     Q.   Did you speak to the ambulance
18 people, the EMS people?
19     A.   I'm not sure.
20     Q.   After the ambulance left, anything
21 else that you can recall relating to this incident
22 that you might have spoken to?
23     A.   No.
24     Q.   Were you -- was there -- strike

Page 14

1  that.
2          When was the next day that you
3  worked?
4      A.   I believe it was that Thursday.
5      Q.   And was there -- did you have a
6  conversation with Danielle Boyle at that time
7  concerning the incident?
8      A.   Yes.
9      Q.   And what did that conversation
10 consist of?
11     A.   We just talked about what happened
12 again, and she asked me to write down the
13 incident.
14     Q.   All right. In front of you, which
15 has been marked as Boyle-1, appears to be a
16 statement that you just referenced.
17         Can you take a look at that?
18     A.   (Witness complies.)
19     Q.   I think I can understand your
20 handwriting, but I may just ask you to read it so
21 we have a clear record of what you say.
22     A.   Okay.
23         MR. DROOGAN: Before you do that,
24     off the record.

Page 15

1           - - -
2          (Whereupon, a discussion took place
3      off the stenographic record.)
4           - - -
5  BY MR. FOX:
6      Q.   All right. We'll go as slow as you
7  want.
8      A.   The man and his son were getting
9  snacks and hotdogs. They paid and left with his
10 son. I proceeded to look in my register. I heard
11 a loud yell which made me look up immediately. I
12 saw the man laying on his left side right in front
13 of the step outside the entrance. I went outside
14 to see what happened, he said he fell. So I
15 offered to call an ambulance. I went inside and
16 called 911. The operator asked for more info. So
17 I went back outside to ask. He had his head in
18 his wife's lap with his son standing next to him.
19 I asked him the questions the operator wanted to
20 know. I told him the ambulance would be there
21 very soon and then went inside to call my manager
22 what happened. I checked on him again and went
23 back. And the ambulance came for him shortly
24 after.

Page 16

1      Q.   So the operator you're referring to
2  in the statement is the 911 operator?
3      A.   Yes.
4      Q.   It's not a Speedway person?
5      A.   No.
6          MR. DROOGAN: Let him finish his
7      question.
8  BY MR. FOX:
9      Q.   And although this statement is
10 stamped by Speedway on January 27th of 2016, do
11 you know when you wrote this statement in
12 relationship to the date of the accident?
13     A.   I can't recall the date.
14     Q.   Now, as part of your statement you
15 say like the sixth line down, you say, he said he
16 fell, so I offered to call an ambulance; correct?
17     A.   Uh-huh.
18     Q.   Now, you told me that he said that
19 he was late, not paying attention and he tripped
20 on his own feet. Did you not -- that is not in
21 this statement; correct?
22     A.   Yes.
23     Q.   After you prepared this statement,
24 anyone else contact you other than your attorney

5310e10a-900f-491f-a102-512c32e207fd

Page 17

1   about this incident from Speedway?
2       A.   No.
3       Q.   Was your preparation of this
4   statement the end of your involvement in this
5   matter?
6           MR. DROOGAN:  Until she was called
7       for a deposition?
8           MR. FOX:  Yes.
9           THE WITNESS:  Yes.
10  BY MR. FOX:
11      Q.   In other words, a regional manager
12  didn't interview you, corporate didn't interview
13  you, things like that?
14      A.   No.
15      Q.   This is it?
16      A.   This is it.
17      Q.   I know that you weren't at the
18  store that long in November of 2015.
19          But in your time at the store, did
20  anyone ever complain to you about any problems
21  with walking inside, walking up the curb into the
22  store or out of the store?
23      A.   No.
24      Q.   I think I'm almost done.

Page 18

1           Were you involved -- Danielle Boyle
2   prepared an incident report for Speedway.
3           Were you involved in the
4   preparation of that report at all?
5       A.   No.
6           MR. DROOGAN:  Boyle-3 is in front
7       of her.
8           THE WITNESS:  No.
9   BY MR. FOX:
10      Q.   That's something you've never seen
11  before?  Let me strike that.
12          You were not involved in the
13  preparation of that report; correct?
14      A.   No.
15      Q.   So the only document that you were
16  involved with is this statement that you wrote up?
17      A.   Yes.
18      Q.   Correct?
19      A.   Yes.
20          MR. FOX:  That's all I have.  Thank
21      you.
22                  - - -
23              EXAMINATION
24                  - - -

Page 19

1   BY MR. DROOGAN:
2       Q.   Ms. McCarthy, you had explained
3   that you spoke with Ms. Boyle the evening of the
4   incident?
5       A.   Yes.
6       Q.   Did you share with Ms. Boyle the
7   statements that were made by Mr. Sutton to you
8   about him being late for a game and not paying
9   attention and tripping over his own feet?
10      A.   Yes, I did.
11      Q.   During the time that you've worked
12  at Speedway before this, from the Monday before
13  Thanksgiving of 2015 up until this incident, did
14  anyone ever fall walking from the store out off
15  the sidewalk and onto the area between the pumps
16  and the sidewalk?
17      A.   No.
18          MR. DROOGAN:  No further questions.
19                  - - -
20          (Whereupon, the deposition
21      concluded at 3:07 p.m.)
22                  - - -
23
24

Page 20

1
2
3               CERTIFICATION
4
5           I, DOUGLAS S. DIAMOND, hereby
6   certify that the foregoing is a true and correct
7   transcript transcribed from the stenographic notes
8   taken by me on Tuesday, February 28, 2017.
9
10
11
12          DOUGLAS S. DIAMOND
            Court Reporter - Notary Public
13          (This certification does not apply
14  to any reproduction of this transcript, unless
15  under the direct supervision of the certifying
16  reporter.)
17
18
19
20
21
22
23
24

**A**
accident 4:21 7:18 7:20 8:3,11,14 16:12
ago 5:13
ambulance 9:2 11:2,6,10,19 12:2 12:4,8,20 13:1,10 13:17,20 15:15,20 15:23 16:16
answer 5:10
appear 10:2
appears 14:15
apply 20:13
approximately 1:17
area 19:15
asked 11:18 12:18 13:7 14:12 15:16 15:19
attend 10:23 11:1,5
attention 9:21 16:19 19:9
attorney 16:24
aware 8:2

**B**
back 10:13,17 11:5 15:17,23
basically 11:19
beginning 1:16 7:1
believe 10:16 14:4
bit 5:16
Boyle 11:21 14:6 18:1 19:3,6
Boyle-1 14:15
Boyle-3 18:6

**C**
C 2:1
call 4:22 6:16 7:15 9:2 11:18,21,24 12:8 15:15,21 16:16
called 9:3,5 15:16 17:6
captured 13:8
cashier 6:1,9,14 7:21

Cavo 1:14 2:8
certification 4:4 20:3,13
Certified 1:18
certify 20:6
certifying 20:15
chair 12:19
change 6:24
checked 15:22
clear 14:21
close 7:8,12
come 11:3
coming 11:10 12:11 13:2,10
COMMON 1:1
Commonwealth 1:19
complain 17:20
complies 14:18
concerning 5:1 14:7
concluded 19:21
consist 14:10
contact 16:24
convenience 6:11
conversation 10:14 14:6,9
conversations 11:12 13:13
corporate 17:12
correct 16:16,21 18:13,18 20:6
counsel 2:5,10 4:3
court 1:1,18,21 5:8 5:10 20:12
CSRs 6:19
curb 17:21
currently 5:18,22
customer 6:17 12:7 12:16
customers 6:10 10:21 11:1

**D**
D 3:1
Danielle 11:21 12:6 12:14 14:6 18:1
date 1:16 16:12,13
day 14:2

Defendant 1:9
Defendants 2:10
deposition 1:13 5:2 17:7 19:20
DESCRIPTION 3:13
Diamond 1:18,21 20:5,11
direct 20:15
discussion 15:2
dislocated 10:5
DISTRICT 1:2
document 18:15
doing 11:11
Douglas 1:17 20:5 20:11
driveway 10:18
Droogan 2:8 3:5 14:23 16:6 17:6 18:6 19:1,18
droogan@litchfi... 2:11
duly 4:10
duties 6:8

**E**
E 2:1,1 3:1
E-mail 2:6,11
eight 7:7
Emerson 1:22
employed 5:22 6:3
EMS 13:18
entrance 15:13
ESQUIRE 2:2,8
evening 7:4 19:3
evenings 7:2
exactly 9:1 12:15
Examination 3:4,5 4:13 18:23
examined 4:10
EXHIBITS 3:13
explained 19:2

**F**
F 2:2
fair 8:13,15
fall 19:14
fallen 12:7,10,11,16
familiar 13:3
FAX 1:23

February 1:11 20:8
feel 5:14
feet 9:22 16:20 19:9
fell 15:14 16:16
filing 4:4
finish 5:9 16:6
finished 10:15
FIRST 1:2
follows 4:11
foregoing 20:6
form 4:6
Fox 2:2,2 3:4 4:15 4:19 15:5 16:8 17:8,10 18:9,20
front 14:14 15:12 18:6
further 19:18

**G**
game 9:20 19:8
getting 15:8
given 5:2
Glenside 4:22 5:19
go 10:13,17 11:5 15:6
going 12:10
grab 13:7
ground 8:6,22 9:23
guess 5:14
guesses 5:17
guessing 5:15

**H**
h/w 1:5
handwriting 14:20
hang 9:10
happened 4:21 5:13 7:18 11:13 13:1 14:11 15:14 15:22
head 5:11 15:17
hear 8:16
heard 8:5,17,18,19 13:1 15:10
hotdogs 15:9
hours 7:7
hung 10:15

**I**
immediately 15:11

incident 5:1 7:24 13:8,21 14:7,13 17:1 18:2 19:4,13
independent 7:24
info 15:16
information 10:7
inside 15:15,21 17:21
interview 17:12,12
involved 18:1,3,12 18:16
involvement 17:4

**J**
January 4:21 7:19 16:10
JEAN 1:5
Jersey 1:22
John 2:2 4:19
johnfox@jfoxla... 2:6
JR 2:2,8
JUDICIAL 1:2

**K**
Kate 1:13 3:3 4:9 4:18,19
kneecaps 10:6
know 5:7 12:9 13:6 15:20 16:11 17:17
knowledge 4:24

**L**
Lane 1:22
lap 15:18
late 9:20 16:19 19:8
Law 1:14 2:2
laying 12:20 15:12
left 13:20 15:9,12
likes 6:16
line 9:11,12 16:15
Litchfield 1:14 2:8
little 5:16
LLC 1:8
LLP 2:8
location 7:10
LOGAN 2:3
long 5:5 6:2 7:6 17:18
look 14:17 15:10,11

**looked** 8:5
**looks** 7:19
**loud** 15:11

**M**

**man** 8:6,7,10 15:8, 15:12
**manager** 15:21 17:11
**marked** 3:14 14:15
**Market** 1:14 2:9
**married** 5:20
**matter** 17:5
**McCarthy** 1:13 3:3 4:9,18 19:2
**MICHAEL** 2:8
**Monday** 6:4 19:12
**months** 7:20
**mornings** 7:2
**mouthed** 11:16,20

**N**

**N** 2:1 3:1
**name** 4:16,19
**narrow** 5:16
**needed** 10:23
**never** 18:10
**New** 1:22
**night** 4:23 7:15,16
**nods** 5:11
**NORTH** 2:3
**Notary** 1:18 20:12
**notes** 20:7
**November** 17:18

**O**

**objections** 4:5
**offered** 15:15 16:16
**Offices** 1:14
**okay** 8:18 9:2 12:18 14:22
**operator** 9:7,8 15:16,19 16:1,2
**Oral** 1:13
**originally** 11:18
**outside** 8:5,21,22 8:23 9:4,6,11 15:13,13,17

**P**

**P** 2:1,1
**P.C** 2:2
**p.m** 1:17 7:5 19:21
**PAGE** 3:2,13
**paid** 15:9
**pain** 10:2
**part** 16:14
**particular** 6:23
**paying** 9:20,21 16:19 19:8
**Pennsylvania** 1:2 1:15,20 2:4,10
**people** 13:18,18
**person** 16:4
**Philadelphia** 1:15 2:4,10
**pick** 10:13
**place** 15:2
**Plaintiff** 2:5
**Plaintiffs** 1:6
**PLEAS** 1:1
**please** 4:17
**point** 11:23
**position** 5:24
**preparation** 17:3 18:4,13
**prepared** 16:23 18:2
**present** 1:20
**problems** 17:20
**proceeded** 15:10
**process** 11:23
**Public** 1:19 20:12
**pumps** 19:15

**Q**

**question** 4:6 5:6,10 5:13 9:6 16:7
**questions** 4:24 15:19 19:18

**R**

**R** 2:1
**read** 14:20
**really** 11:17 12:21
**recall** 7:23 8:7 9:1 9:5,14,15 10:9,12 10:19 12:15,24 13:10,21 16:13
**receive** 6:12
**recollection** 7:24
**record** 4:17 14:21 14:24 15:3
**referenced** 14:16
**referring** 16:1
**regional** 17:11
**register** 8:4,8 15:10
**registers** 6:21
**relating** 13:21
**relationship** 16:12
**remember** 13:12
**rephrase** 5:7,15
**report** 18:2,4,13
**reporter** 1:18 5:8 5:11 20:12,16
**REPORTING** 1:21
**represent** 4:20
**reproduction** 20:14
**reps** 6:17
**reserved** 4:6
**reside** 5:18
**respect** 4:20
**respond** 5:12
**response** 12:17
**right** 5:17 10:12 14:14 15:6,12
**ring** 6:10,21
**Rod** 1:4 4:20

**S**

**S** 1:17 2:1 20:5,11
**saw** 8:5,22 15:12
**saying** 9:15 11:11
**scenario** 11:24
**sealing** 4:3
**security** 13:3,4
**see** 11:10 15:14
**seen** 8:10 18:10
**sell** 6:10
**service** 6:17
**Sewell** 1:22
**share** 19:6
**shift** 6:23 7:4,6,14 7:15,16,16
**shortly** 11:9 15:23
**showed** 6:21
**side** 15:12
**sidewalk** 19:15,16
**signing** 4:3

**six** 7:7
**sixth** 16:15
**SLAPPY-SUTT...** 1:4
**slow** 15:6
**snacks** 15:9
**son** 13:14 15:8,10 15:18
**son's** 9:20
**soon** 15:21
**speak** 11:15 13:17
**Speedway** 1:8 4:22 5:23 6:16 16:4,10 17:1 18:2 19:12
**spoke** 19:3
**spoken** 13:22
**SQUARE** 2:3
**stamped** 16:10
**standing** 15:18
**start** 7:4
**started** 6:4 7:9
**state** 4:16
**statement** 14:16 16:2,9,11,14,21 16:23 17:4 18:16
**statements** 19:7
**stenographic** 15:3 20:7
**step** 15:13
**stipulated** 4:2
**store** 6:11 10:21 12:10,11,12 13:4 17:18,19,22,22 19:14
**Street** 1:15 2:3,9
**strike** 13:24 18:11
**sudden** 8:5
**Suite** 1:15 2:4,9
**supervision** 20:15
**sure** 13:19
**surveillance** 13:4
**Sutton** 1:5 4:20 9:13,15 10:18 11:2,6 13:14 19:7
**sworn** 4:10
**system** 13:4,5

**T**

**T** 2:8

**take** 5:5,8,11 14:17
**taken** 1:13 20:8
**talk** 12:3
**talked** 12:1 14:11
**talking** 5:9
**Tel** 2:5,11
**tell** 5:15 11:9 12:6 12:14
**testified** 4:11
**thank** 11:16,20 18:20
**Thanksgiving** 6:5 19:13
**things** 6:10,21 17:13
**think** 11:17 14:19 17:24
**thought** 10:5
**Thursday** 14:4
**time** 4:7 5:9 7:3,12 10:11 11:6 12:9 13:15 14:6 17:19 19:11
**times** 11:17
**told** 12:15,24 15:20 16:18
**training** 6:12,19
**transcribed** 20:7
**transcript** 20:7,14
**trial** 4:7
**tripped** 9:21 16:19
**tripping** 19:9
**true** 20:6
**try** 5:7,15
**Tuesday** 20:8
**turned** 8:21
**TWO** 2:3
**typical** 7:3

**U**

**uh-huh** 5:12 16:17
**un-unh** 13:9
**understand** 5:6 14:19
**understanding** 4:23

**V**

**verbally** 5:12
**video** 13:7

| | |
|---|---|
| **vs** 1:7 | **1515** 1:14 2:9 |
| | **18TH** 2:3 |
| **W** | **19** 3:5 |
| **wait** 10:20 | **19102** 1:16 2:10 |
| **waiting** 8:7 11:2 | **19103** 2:4 |
| **waived** 4:4 | **19th** 4:21 7:19 |
| **walking** 17:21,21 19:14 | **2** |
| **want** 5:14,17 10:7 15:7 | **2:16-CV-04765** 1:6 |
| | **2:48** 1:17 |
| **wanted** 11:18 15:19 | **2015** 6:6 17:18 19:13 |
| **wasn't** 9:19,20,21 12:21 | **2016** 4:21 7:19 16:10 |
| **way** 5:8,16 10:16 11:11 12:2,20 | **2017** 1:11 20:8 |
| **We'll** 15:6 | **2030** 2:4 |
| **went** 8:21,22,23 9:3 9:6,11 15:13,15 15:17,21,22 | **215** 2:5,11 |
| | **24-hour** 7:10 |
| | **27th** 16:10 |
| **weren't** 17:17 | **28** 1:11 20:8 |
| **wife** 4:20 11:15 13:14 | **3** |
| **wife's** 15:18 | **3:00** 7:5 |
| **witness** 3:2 4:10 8:14 14:18 17:9 18:8 | **3:07** 19:21 |
| | **4** |
| **words** 17:11 | **4** 1:22 3:4 |
| **work** 6:23 | **5** |
| **worked** 6:20 14:3 19:11 | **5:00** 7:5 |
| **write** 14:12 | **557-0111** 2:11 |
| **wrote** 16:11 18:16 | **568-6868** 2:5 |
| | **589-1107** 1:23 |
| **X** | **589-4741** 1:23 |
| **X** 3:1 | **6** |
| **Y** | **7** |
| **year** 5:13 6:5,5 | |
| **yell** 8:5,17,18,19 15:11 | **8** |
| | **856** 1:23,23 |
| **Z** | **9** |
| **0** | **911** 9:3,8,10 10:7 10:14 12:1 15:16 16:2 |
| **08080** 1:22 | |
| **1** | |
| **100** 2:3 | |
| **11:00** 7:13 | |
| **1220** 1:15 2:9 | |